1  JILL M. MANNING (Bar No. 178849)
     jmanning@pwfirm.com
2  **PEARSON WARSHAW, LLP**
3  555 Montgomery St., Suite 1205
   San Francisco, California 94111
4  Telephone: (415) 433-9000

5  DANIEL L. WARSHAW (Bar No. 185365)
     dwarshaw@pwfirm.com
6  BOBBY POUYA (Bar No. 245527)
     bpouya@pwfirm.com
7  NAVEED ABAIE (Bar No. 323338)
     nabaie@pwfirm.com
8  ERIC J. MONT (Bar No. 319592)
     emont@pwfirm.com
9
   **PEARSON WARSHAW, LLP**
10 15165 Ventura Boulevard, Suite 400
   Sherman Oaks, California 91403
11 Telephone: (818) 788-8300

12 [*Additional counsel listed on the signature page*]

13 Attorneys for Plaintiff and the Proposed Class

14

15            **UNITED STATES DISTRICT COURT**

16            **NORTHERN DISTRICT OF CALIFORNIA**

17                **SAN FRANCISCO DIVISION**

18 | Christina Grace, Individually and on Behalf of | CASE NO. |
   | All Others Similarly Situated, | |

19 |  | **CLASS ACTION COMPLAINT** |
   |                 Plaintiff, | |
20 |  | For Violations of: |
21 |         v. | |
   |  | (1) The Sherman Act, 15 U.S.C. § 1; |
22 | National Association of Realtors, RE/MAX | (2) The Cartwright Act, California Business |
   | Holdings, Inc., Anywhere Real Estate Inc., | and Professions Code §§16720 *et seq*.; and |
23 | Keller Williams Realty, Inc., Compass, Inc., | (3) The Unfair Competition Law, California |
   | eXp World Holdings, Inc., Bay Area Real | Business and Professions Code §§17200 *et* |
24 | Estate Information Services, Inc., Marin | *seq*. |
   | Association of Realtors, North Bay | |
25 | Association of Realtors, Northern Solano | |
   | County Association of Realtors, Inc., and | **DEMAND FOR JURY TRIAL** |
26 | Solano Association of Realtors, Inc. | |
27 |                 Defendants. | |
28

*(left vertical margin)* PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

Plaintiff Christina Grace ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action on behalf of herself and all others similarly situated, against the Defendants, and alleges as follows:

## NATURE OF THE LAWSUIT

1. This is a class action brought by Plaintiff on behalf of herself and all others similarly situated who listed their homes for sale on the Bay Area Real Estate Information Services, Inc. ("BAREIS MLS") in Marin, Mendocino, Napa, Solano, or Sonoma counties ("BAREIS Counties") and paid a buyer broker commission.

2. Plaintiff and Class members allege that during the four years prior to the filing of this Complaint ("Class Period"), Defendants have conspired and continue to conspire to restrain trade by causing home sellers to pay buyer broker fees and inflated commissions on the sale of their homes, in violation of Section 1 of the Sherman Act, the Cartwright Act, California Business and Professions Code §§ 16720 *et. seq,* and California's Unfair Competition Law, California Business and Professions Code §§ 17200 *et. seq.* ("UCL").

3. Defendants are the National Association of Realtors ("NAR"), BAREIS MLS, the Realtor Association Defendants, and the following national real estate brokerages: Compass, Inc., eXp World Holdings, Inc., Keller Williams Realty, Inc., Anywhere Real Estate Inc., and RE/MAX Holdings, Inc. (the latter group is the "Brokerage Defendants" and with NAR, BAREIS MLS and Realtor Association Defendants, they are referred to collectively as "Defendants").

4. A multiple listing service ("MLS") is a database of properties listed for sale in a particular geographic region that is accessible to real estate brokers and their realtors[1] or agents that comply with the rules of the MLS.[2] Brokers that are members of an MLS are required to list all properties on the MLS. As set forth above, BAREIS MLS covers the aforementioned counties in Northern California.

---

[1] The term "realtor" or "REALTOR®" is both a trademark owned by NAR and a valuable membership benefit that distinguishes members from all others in the real estate business.

[2] *See* National Association of Realtors®, Handbook on Multiple Listing Policy (2023), *available at* https://cdn.nar.realtor/sites/default/files/documents/pdf_mls_handbook-2023-08-11.pdf?_gl=1*1am0u9c*_gcl_au*OTEyNDA1NDUzLjE2OTk5MTA4Nzc ("NAR Handbook").

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

5.      The gravamen of Plaintiff's claim is that the anti-competitive BAREIS MLS rules require all home sellers to agree to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation when listing a property on the BAREIS MLS (hereinafter "Anticompetitive Broker Rules").

6.      Unlike the vast majority of MLSs in the United States, BAREIS MLS is not exclusively owned or operated by realtor associations; rather, it is partly broker owned.[3]

7.      Throughout the Class Period, the BAREIS MLS board, and virtually all committee members and broker owners were all NAR members, and members of at least one of the Realtor Association Defendants. NAR members are required to comply with rules set out in the NAR Handbook and NAR's Code of Ethics. Access to BAREIS MLS is conditioned on members' agreement to adopt and follow the BAREIS MLS rules.[4]

8.      As such, the BAREIS MLS members who were franchisees and agents of the Brokerage Defendants were obligated to and did adopt, implement, and enforce anticompetitive restraints, including the Anticompetitive Broker Rules, through their control of the BAREIS MLS board and its committees. Specifically, the BAREIS MLS adopted, implemented, and enforced BAREIS MLS Rule 11.2[5] ("Rule 11.2"), which requires all home sellers to make a blanket, unilateral and non-negotiable offer of buyer broker compensation.[6] As to the potential possibility that buyers might seek to reduce their broker's commission by making that reduction a condition of a purchase offer, BAREIS MLS adopted, implemented, and enforced another rule, BAREIS

---

[3] *See* BAREIS MLS, Amended and Restated Bylaws of Bay Area Real Estate Information Services, Inc., pgs. 3-5 (Apr. 1, 2022), *available at* https://bareis.com/root-documents/forms/forms-1/rules-forms/619-bareis-bylaws/file.html.

[4] BAREIS MLS penalizes and discourages potential noncompliance with its anticompetitive rules. *See id.* at pg. 6.

[5] Rule 11.2 (Aug. 1, 2023), *available at* https://bareis.com/about/rules-and-regulations.html.

[6] Rule 11.2 is the functional equivalent of NAR MLS Handbook at Section 2-G-1, which requires a seller broker who lists on any MLS make blanket unilateral offers of commission to any buyer broker, was adopted, implemented, and enforced by the BAREIS MLS, through coordination amongst the Defendants.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

MLS Rule 11.5[7] ("Rule 11.5"), which explicitly prevents this from happening. These rules are the functional equivalents of the anticompetitive restraints that have been adopted, implemented, and enforced by NAR—NAR MLS Handbook at Section 2-G-1 ("Section 2-G-1") and NAR's Code of Ethics, Standard Practice 16-16 ("Standard Practice 16-16").

9.      The Realtor Association Defendants are part-owners of BAREIS MLS. They are affiliated with the NAR, which requires that its members join a local realtor association prior to becoming an NAR member.

10.      The NAR requires that Realtor Association Defendants fully comply with the anti-competitive rules detailed herein, and with other rules contained in the NAR Handbook and the NAR Code of Ethics. Furthermore, the NAR periodically reviews the Realtor Association Defendants' governing documents to demonstrate confirm compliance with these rules by periodically sending their governing documents to NAR for review.

11.      The Realtor Association Defendants are required to enforce the NAR Handbook and the NAR Code of Ethics rules, policies, and practices on its members. As such, the Realtor Association Defendants participated in the adoption, implementation, and enforcement of the Anticompetitive Broker Rules.

12.      Each Brokerage Defendant mandates that franchisees, brokerages, and individual realtors join and implement NAR's anticompetitive rules to receive the benefit of Brokerage Defendants' branding, brokerage infrastructure, and general support. As some of the leading brokers in the United States, their knowing acts of forming and/or joining and participating in the conspiracy, by implementing and enforcing NAR rules and policies, were essential to the success of the conspiracy.

13.      Because of Brokerage Defendants' agreements with their local franchisees and agents, their employee policy and procedures manuals, Brokerage Defendants' leadership roles in the NAR, and pressure from the Brokerage Defendants, local franchisees and agents located in the BAREIS Counties agreed to ensure that BAREIS MLS's rules contain the Anticompetitive Broker

---

[7] Rule 11.5 (Aug. 1, 2023), *available at* https://bareis.com/about/rules-and-regulations.html.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

Rules, which are the functional equivalents of Section 2-G-1 and Standard Practice 16-16. Brokerage Defendants use their leadership roles on or within NAR to further implement the conspiracy by reviewing NAR's rules and agreeing to them at yearly meetings, and NAR further advances the conspiracy by regularly re-issuing its rules, including Section 2-G-1.

14.    The local franchisees and agents of the Brokerage Defendants participate in and implement the conspiracy by serving on the BAREIS MLS board and its committees, which adopt, implement, and enforce compliance with NAR rules.

15.    Defendants' conspiracy forces home sellers to pay a cost that, in a competitive market, would be paid by the buyer. To gain the cooperation of buyer brokers, selling brokers are also incentivized to offer a higher buyer broker commission as part of complying with anticompetitive rules that require all home sellers to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation.

16.    Another powerful and destructive effect in the marketplace that results from and is amplified by Defendants' anticompetitive conduct is the practice of steering. Given the requirement that seller brokers make a blanket and unilateral offer of commission to buyer brokers, buyer brokers face strong incentives to steer their buyer clients toward homes where the buyer broker would receive a higher commission. Steering is a key reason why agent commissions have remained high in the United States during the internet era, even as commissions in other countries have plummeted. Economic studies and literature have documented and confirmed the prevalence and significance of steering.[8] A recent academic study found that systematic and nationwide evidence that buyer agents steer clients away from properties that offer low buyer agent commissions.[9]

17.    In a typical real estate transaction in the BAREIS Counties, different real estate brokers will represent the home seller and home buyer. Both the buyer broker and the seller broker

---

[8] *See* Roger P. Alford & Benjamin H. Harris, *Anticompetition in Buying and Selling Homes*, Cato Institute (2021), *available at* www.cato.org/regulation/summer-2021/anticompetition-buying-selling-homes

[9] *See* Jordan Barry, Will Fried & John William Hatfield, *Et Tu, Agent? Commission-Based Steering in Residential Real Estate* (Oct. 9, 2023), *available at* https://ssrn.com/abstract=4596391

are paid a percentage of a home's sales prices. Currently, total broker compensation in the United States is typically 5 to 6% of the home sales price.[10] Approximately, one half of that amount is paid to the buyer broker.[11] With housing costs in the BAREIS Counties sky-rocketing, these broker fees can easily amount to tens of thousands of dollars.[12]

18.    In a competitive market, the seller would pay nothing to the buyer broker, who would instead be paid by the buyer (their client), and the total commission paid by the seller would be set at a level to compensate only the seller's broker. In a competitive market, the cost of buyer broker commissions would be paid by home buyers, and buyer brokers would compete with one another, including by potentially offering a lower commission rate. The anticompetitive rules adopted by BAREIS  restrain price competition among buyer brokers because the home buyer that retains the buyer broker does not negotiate or pay any commission to his or her broker.

19.    In competitive foreign markets, including the United Kingdom, Germany, Israel, Australia, and New Zealand, if home buyers decide to use a broker, they pay that broker less than half the rate paid to buyer brokers in California. In these foreign markets, which are not affected by anticompetitive rules, buyer brokers are paid by home buyers, rather than home sellers.

20.    A 2015 report commissioned by NAR to study negative emerging trends in the real estate industry highlighted concerns that total commissions in the United States are inflated compared to various international markets. According to this report, the average total commissions range between 1% and 3% in countries such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium.[13]

---

[10]  *See* Anna Bahney, *Why are real estate commissions 6%? – and why that may be changing*, CNN (Dec. 3, 2023), *available at* https://finance.yahoo.com/news/why-real-estate-commissions-6-225830372.html

[11]  *Id.*

[12]  According to Zillow, the median home price in Marin County, where Plaintiff sold her home in 2020, is just over $1.4 million. www.zillow.com/home-values/625/marin-county-ca. Thus, the average broker commission on such a sale would be $70,000 – $84,000.

[13]  Swanepoel Group, D.A.N.G.E.R Report, at 22 (definitive analysis of negative game changers emerging in real estate) (2015). The report also suggests that total commissions in Germany range between 3% and 6%.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

21.     Many home buyers no longer require the help of a broker to search for prospective homes. Instead, buyers can start their search process by using online services such as Zillow or Redfin and are increasingly retaining a buyer broker after having already found a target home.

22.     Despite the diminishing role of buyer brokers, commissions for buyer brokers have held steady in the 2.5% to 3% range because of conspiracy alleged herein. Furthermore, because housing prices significantly increased during the Class Period, and because commissions are calculated as a percentage of the home's sales price, the actual dollar amounts of buyer commissions substantially increased as well.

23.     Despite transaction costs dramatically decreasing in other sectors and industries that benefit from technological advances, real estate commission rates have persisted and remain steady in a range of 5% to 6%. Defendants provide uniform training to seller brokers to maintain such rates and to split commissions equally with buyer brokers. Because these commissions are set via blanket offers agreed to prior to a home being listed, buyer brokers receive the same percentage amount regardless of the amount of work, thereby stifling competition.

24.     Because buyer brokers will not show homes to their clients where the seller broker is offering a lower buyer-broker commission or will show such homes later in the search process, seller brokers face pressure in making their unilateral blanket offers to provide high commissions to buyer brokers.

25.     Moreover, in the absence of Defendants' anticompetitive restraints, seller brokers would likely face additional competitive pressures. Instead of following the long-time practice of setting total commissions at or near 6%, and assigning roughly half of that amount to themselves and roughly the other half to the buyer broker (and selecting that amount at a level to remain in the good graces of buyer brokers), seller brokers would set a commission to pay themselves alone and would likely begin to engage in more vigorous competition with one another to lower their rates and/or provide additional services to justify their rates.

26.     By agreeing to adopt, implement, and enforce the anticompetitive rules at issue , the Defendants participated in a conspiracy to restrain trade by requiring home sellers to pay the broker representing the buyer of their homes, and to pay inflated commissions.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

27. Defendants' conspiracy inflated buyer broker commissions, which in turn inflated the total commissions paid by home sellers such as Plaintiff and Class members. Plaintiff and Class members each incurred, on average, thousands of dollars in overcharges and damages due to Defendants' conspiracy.

28. In sum, the conspiracy has had and continues to have multiple harmful and anticompetitive effects, including: (a) requiring sellers to pay overcharges for services provided by buyer brokers to the buyer; (b) raising and stabilizing buyer broker compensation at levels that would be lower in a competitive marketplace; and (c) encouraging and facilitating steering and other actions that impede innovation and entry by new and lower-cost real estate brokerage service providers.[14]

**JURISDICTION AND VENUE**

29. This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

30. This Court also has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from Defendants.

31. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to the claims occurred in this District.

32. Assignment to the San Francisco Division of this district is appropriate under Civil Local Rule 3-2 because a substantial part of the events or omissions which gave rise to the claims occurred in the San Francisco Division.

/ / /

---

[14] This lucrative broker commission system is currently facing antitrust scrutiny by the Antitrust Division of the United States Department of Justice. *See* Jordan Yadoo and Leah Nylen, *Real Estate Brokers Pocketing Up to 6% in Fees Draw Antitrust Scrutiny*, Bloomberg (2023), *available at* www.bloomberg.com/news/articles/2023-10-16/us-realtors-lucrative-fee-system-faces-mounting-antitrust-risk#xj4y7vzkg.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

**PARTIES**

**A.**     **Plaintiff**

33.     Plaintiff Christina Grace is a resident and citizen of the State of California. Plaintiff sold her home located in Marin County, California, in April 2020. Plaintiff's home was listed for sale on the BAREIS MLS. Upon closing the sale of her home, Plaintiff paid a $29,358 commission to the listing agent (3.5% of the sale price) and a $20,970 commission to the buyer agent (2.5% of the sale price), for a total of $50,328.

34.     As set forth in this Complaint, Defendants' unlawful conduct and conspiracy caused Plaintiff to pay a buyer broker commission and artificially increased the amount of the buyer broker commission to a rate higher than it would have been in a competitive market.

**B.**     **Defendants**

35.     Defendant NAR, a lobbying group that advocates for the interests of real estate brokers, has over 1.5 million individual members from whom it has collected hundreds of millions of dollars in dues and membership fees, including millions of dollars in dues and membership fees from NAR members located in this District. NAR oversees fifty-four state and territorial realtor associations and over 1,200 local realtor associations. NAR is headquartered in Chicago, Illinois.

36.     Defendant RE/MAX Holdings, Inc. ("RE/MAX") is one of the nation's largest real estate brokerages. It is headquartered in Denver, Colorado. RE/MAX is publicly traded and has a market value of approximately one billion dollars. It franchises local RE/MAX brokers around the country, which have approximately 6,800 offices and more than 100,000 sales associates. RE/MAX franchises in and transacts substantial business in California, including in this District.

37.     Defendant Anywhere Real Estate Inc., formerly known as Realogy Holdings Corp. ("Anywhere Real Estate") is the nation's largest real estate brokerage company. Headquartered in Madison, NJ, Anywhere Real Estate is a publicly-traded corporation with a market value of over $4 billion. It owns, operates, and franchises real estate brokerage firms, including Century 21, Coldwell Banker, Sotheby's International Realty, The Corcoran Group, Better Homes and Garden Real Estate, ZipRealty, ERA Real Estate, Citi Habitats, and Climb Real Estate. Anywhere Real

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

Estate franchises in and transacts substantial business in California, including in this District.

38.     Defendant Keller Williams Realty, Inc. ("Keller Williams") is one of the nation's largest real estate brokerages. Headquartered in Austin, Texas, Keller Williams is a privately-held company. It franchises local Keller Williams brokers around the country, which have approximately 700 offices and more than 120,000 sales associates. Keller Williams franchises in and transacts substantial business in California, including in this District.

39.     Defendant Compass, Inc. ("Compass") is a publicly-traded company incorporated in Delaware with its principal place of business in New York. The company's stock began trading on the New York Stock Exchange after its initial public offering in April 2021. Through 2022, Compass represented sellers or buyers in more than 700,000 transactions totaling more than $780 billion in gross transaction value. Compass franchises in and transacts substantial business in California, including in this District.

40.     Defendant eXp World Holdings, Inc. ("eXp") is a publicly-traded company incorporated in Delaware with its principal place of business in Bellingham, Washington. eXp offers the bulk of its real estate brokerage services through its subsidiary, eXp Realty, LLC. eXp has residential real estate brokerages in all 50 states. For the year ending December 31, 2022, eXp's agent count exceeded 86,000 and the company provided brokerage services for over 511,000 transactions. eXp franchises in and transacts substantial business in California, including in this District. As used herein, the term "eXp" refers collectively to eXp World Holdings, Inc. and eXp Realty, LLC.

41.     Defendant BAREIS MLS is a broker-owned multiple listing service serving real estate professionals throughout Marin, Sonoma, Napa, Solano and Mendocino counties in Northern California.[15] There are three main classes of BAREIS MLS owners:[16] 1) Class A: "Any natural person or entity who or which is duly licensed as an active real estate broker" in one of the BAREIS

---

[15]  BAREIS MLS, About BAREIS, *available at* https://bareis.com/about/bareis.html

[16]  BAREIS MLS, Amended and Restated Bylaws of Bay Area Real Estate Information Services, Inc., pgs. 3-5 (Apr. 1, 2022), *available at*  https://bareis.com/root-documents/forms/forms-1/rules-forms/619-bareis-bylaws/file.html.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1    Counties; 2) Class B: the Marin Association of REALTORS®, the North Bay Association of

2    REALTORS®, the Northern Solano Association of REALTORS®, and the Solano Association of

3    REALTORS®; and 3) Class C: "Any natural person who is not a Class A Member but who is duly

4    licensed with the California Department of Real Estate" in one of the BAREIS Counties.

5         42.    Defendant Marin Association of REALTORS® ("MAR") is affiliated with NAR

6    and is an owner of Defendant BAREIS MLS. MAR, founded in 1920, is headquartered in San

7    Rafael, California. Members of MAR are obligated to conduct themselves and their businesses in

8    accordance with the MAR's rules and regulations, constitution and bylaws, as well as the MLS

9    rules and the bylaws and constitutions of MAR and NAR.

10        43.    Defendant North Bay Association of REALTORS® ("NorBAR") is affiliated with

11   NAR and is an owner of Defendant BAREIS MLS. NorBAR is headquartered in Santa Rosa,

12   California. NorBAR is a 3,000 plus member, four county trade association with members in

13   Sonoma County, Napa County, Lake County, and the 101 corridor in Mendocino County.

14        44.    Defendant Northern Solano Association of REALTORS® ("NSAR") is affiliated

15   with NAR and is an owner of Defendant BAREIS MLS. NSAR is headquartered in Fairfield,

16   California. Upon information and belief, NSAR is a professional trade association servicing nearly

17   1,500 realtors in the Northern Solano County.

18        45.    Defendant Solano Association of REALTORS® ("SAR") is affiliated with NAR

19   and is an owner of Defendant BAREIS MLS. SAR is headquartered in Vallejo, California.

20                              **FACTUAL ALLEGATIONS**

21   **I.    Real Estate Industry Background**

22        46.    State licensing laws regulate who can represent buyers and sellers in real estate

23   transactions. There are two categories of licensees: (1) the real estate broker, also known as a

24   "brokerage firm," and (2) the individual real estate licensee or agent. Brokerage firms license

25   individual real estate realtors or agents and are legally responsible for the actions of their licensed

26   realtors or agents.

27        47.    Licensed brokers are the only entities permitted by state law to be paid for

28   representing buyers or sellers in a real estate transaction. This explains why real estate brokerage

1  contracts with sellers and buyers are required to be with brokers, not agents, and all payments to

2  individual realtors or agents pass through the brokers.

3      48.    Most brokers and their individual realtors or agents occupy dual roles: a broker may

4  act as a seller broker for some home sales and as a buyer broker for other home sales.

5      49.    According to NAR, 89% of sellers sold their home with the assistance of a real estate

6  agent in 2023, and 89% of buyers purchased their home with the assistance of a real estate agent

7  or broker in 2023.[17]

8      50.    In typical residential real estate transactions, real estate brokers and agents receive

9  their compensation through commissions that are calculated as a percentage of a home's sale price,

10  and the commissions are paid when the home is sold.

11      51.    A seller broker's compensation is set forth in a listing agreement, a contract between

12  the seller and the seller broker. The listing agreement includes the terms of the listing and often

13  provides that the seller broker has the exclusive right to market the seller's home. Notably, due to

14  anticompetitive restraints, such as Section 2-G-1 and Rule 11.5 (collectively, the "Offer of

15  Compensation Rules"), the listing agreement specifies the total commission a home seller will pay

16  to the seller broker and specifies the amount earmarked to be paid to the buyer broker.

17      52.    Home buyers retain brokers pursuant to written contracts that typically disclose that

18  the buyer broker will be compensated by receiving a commission from the seller. The seller broker

19  then pays the buyer broker a commission out of the total commission paid by the seller in

20  connection with the home sale.

21      53.    The result of these agreements and the Offer of Compensation Rules is that buyer

22  brokers, who are supposed to assist their clients in negotiating against the seller, receive their

23  compensation from the total commission paid by the seller, not from the buyer they represent.

24      54.    Absent the Offer of Compensation Rules, and in a competitive market, a buyer

25  would instead pay his or her broker, and a seller would agree to a pay a commission that would go

26

27  [17]  National Association of Realtors®, Highlights From the Profile of Home Buyers and Sellers

28  (2023), *available at* www.nar.realtor/research-and-statistics/research-reports/highlights-from-the-profile-of-home-buyers-and-sellers

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

solely toward the seller's own broker. The seller's total broker commission would thus be approximately half, or less, of the amount that seller pays as a result of the anticompetitive restraint.

## II.    Adoption of the Anticompetitive NAR Rules

55.    In November 1996, NAR adopted Section 2-G-1 in the NAR Handbook:

> In filing a property with the multiple listing service of an association of Realtors®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants.[18]

56.    The NAR Handbook further states that "[m]ultiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[19]

57.    NAR's Board of Directors, and the committees reporting to it, determine from time to time whether to modify any policies in the NAR Handbook, and NAR's Board of Directors has approved certain changes in recent years.

58.    All policies that are retained unchanged, and all modified or revised or new policies, are then set forth in new editions of the NAR Handbook that are typically issued on an annual basis. NAR's Board of Directors have consistently and repeatedly agreed to retain Section 2-G-1 in the NAR Handbook.

59.    In revising and re-issuing the NAR Handbook, NAR invited Brokerage Defendants to join the following agreement, combination, and conspiracy: Brokerage Defendants can participate in the MLS, and gain the benefits provided by NAR and the MLS, but only upon the condition that they agree to adhere to and enforce the anticompetitive restraints set forth in the NAR Handbook.

60.    Section 2-G-1 shifts a cost to the seller that would otherwise be paid by the buyer

---

[18]  NAR Handbook, at 69.

[19]  *Id.*, at 40.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1   in a competitive market. As *The Wall Street Journal* opined, the result is that home sellers are

2   effectively required to hire a buyer broker if they wish to list their home on an MLS, which requires

3   the services of a seller broker, and that this system is a violation of "the Sherman Anti-Trust [sic]

4   Act that keeps buying agents paid though they offer almost no useful services."[20]

5   61.    Moreover, Section 2-G-1's requirement that the seller broker make a blanket,

6   unilateral offer provides an incentive for seller brokers to cooperate with buyer brokers by offering

7   a high commission for the buyer broker. Brokers often act as a selling broker in one transaction

8   but as a buyer broker in another, which further contributes to the anticompetitive effects of the rule

9   in that it fosters an environment in which brokers work cooperatively to split a total commission,

10  instead of openly competing to earn the business of both potential home sellers and potential home

11  buyers based solely on the services to be provided to that represented party.

12  62.    To foreclose the possibility that a buyer might seek to reduce his, her, or their

13  broker's commission by making that reduction a condition of a purchase offer, NAR adopted

14  Standard Practice 16-16:

> REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[21]

19  In other words, a buyer broker offer to a seller that is conditional on the seller reducing the buyer

20  broker commission expressly violates NAR's ethics rules.

21  63.    NAR implemented the anticompetitive scheme to continue and maintain supra-

22  competitive commissions and impede innovation and lower-priced competition by requiring,

23  through Section 2-G-1, that seller brokers make blanket, unilateral offers of compensation to buyer

---

[20]  Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), *available at* www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734.

[21]  National Association of Realtors®, Code of Ethics and Standard of Practice (Jan. 1, 2023), *available at* https://cdn.nar.realtor/sites/default/files/documents/2023-coe-standards-of-practice-2022-12-28.pdf?_gl=1*1lnx2bs*_gcl_au*MTMwMTE3OTY5NC4xNjk5MDc2ODI2

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

brokers when listing a home on an MLS.

64.     But for Section 2-G-1 and NAR's other anticompetitive rules and policies, buyers (not sellers) would pay the commission to their broker, and brokers would have to compete by offering lower commissions to prospective buyers. And, selling brokers would face downward pressure on total commissions and renewed competition to earn business from home sellers, as seller brokers would no longer be calculating their commission rates to include any compensation for the buyer broker.[22]

## III.    Defendants Knowingly Participated in the Adoption, Implementation, and Enforcement of the Anticompetitive Rules

### A.    NAR

65.     NAR requires its members—which include state and local realtor associations—to adopt its anticompetitive rules.

66.     NAR requires that its members that own and operate MLSs comply with the mandatory provisions in the NAR Handbook and the Code of Ethics. The NAR Handbook states that an agreement by an association to establish an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."[23]

67.     Local realtor associations are required by the NAR to monitor their MLS and its participants to ensure that they comply with mandatory provisions from the NAR Handbook.

68.     Failure to strictly comply with the Code of Ethics can lead to expulsion from NAR:

> Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National

---

[22]  Even if one assumes for the sake of argument that, in a market free of Section 2-G-1, a seller continues to pay all or a portion of the buyer broker's commission, the commission would be far less than the 2.5% to 3.0% currently charged to home sellers, like Plaintiff and Class members, and paid to buyer brokers.

[23] National Association of Realtors®, Code of Ethics and Standard of Practice (Jan. 1, 2019), *available at* https://www.nar.realtor/sites/default/files/documents/2019-COE.pdf.

Association.[24]

69.     If a broker or agent was denied access to a local MLS, then that broker and its agents would not be able to list properties for sale in the database or receive offers of compensation for finding a buyer for a listed property.

70.     NAR's model rules for local realtor associations also require adherence to NAR's Code of Ethics.

71.     NAR further penalizes and discourages potential non-compliance with its anticompetitive rules by withholding professional liability insurance from any associations operating under any bylaws or rules that are not approved by NAR.[25] NAR's position and monitoring of potential non-compliance includes conduct to oversee and monitor realtor associations and MLSs.

72.     NAR reviews the governing documents of its local realtor associations to ensure compliance with NAR rules. NAR requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

73.     NAR previously took actions to stifle innovation and competition among real estate brokers, including actions that led to the United States Department of Justice Antitrust Division filing a lawsuit to enjoin a NAR "policy that obstruct[ed] real estate brokers who use innovative Internet-based tools to offer better services and lower costs to consumers." NAR ultimately agreed to a final judgment requiring that it modify and abandon the challenged policy.[26] This lawsuit illustrates that NAR has a history of formulating, adopting, and enforcing anticompetitive policies that stifle innovation and restrain competition in violation of federal law.

74.     In fact, NAR and the real estate industry's history of anticompetitive conduct extends much farther back, in that for much of the first half of the 20th Century realtors operated under express agreements to use specified commission percentages in home sale transactions, until

---

[24] National Association of Realtors®, Code of Ethics and Arbitration Manual 2019, at 1, *available at* https://www.nar.realtor/sites/default/files/documents/2019-CEAM.pdf.
[25] NAR Handbook, at 8.
[26] *See* www.justice.gov/archive/atr/public/press_releases/2005/211008.htm; *see also* www.justice.gov/atr/case-document/final-judgment-142.

16

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

the Supreme Court declared such a scheme an illegal price-fixing arrangement under the federal

antitrust laws in *United States v. Nat'l Ass'n of Real Estate Bds.*, 339 U.S. 485 (1950).

**B.**   **BAREIS MLS**

75.   Unlike the vast majority of MLSs in the United States, BAREIS MLS is not

exclusively owned or operated by realtor associations; rather, it is partly broker owned.[27]

76.   Although BAREIS MLS is not exclusively owned or operated by Realtor

Association Defendants, throughout the Class Period, the BAREIS MLS board, and virtually all

committee members and broker owners were all NAR members and members of at least one of the

Realtor Association Defendants. Access to BAREIS MLS is conditioned on members' agreement

to follow the BAREIS MLS rules, which include but are not limited to Rules 11.2 and 11.5.

77.   Specifically, Rule 11.2 states that:

> By submitting a listing in the MLS Data, the Listing Broker is making
> a blanket, unilateral contractual offer of compensation, if any, to the
> other Broker Participants and, through the Broker Participants, other
> Members, for their service in selling the property. This offer of
> compensation, if any, is also made to members of organizations that
> are parties to the Cross Pollination Agreement. A Listing Broker shall
> specify the compensation, if any, in a dollar amount, as a percentage
> of the sales price, or other consideration, to be paid to a Buyer's
> Broker.[28]

78.   Rule 11.2 forces home sellers to pay a cost that in a competitive would instead be

paid by the buyer. To gain the cooperation of buyer brokers, selling brokers are also incentivized

to offer a higher buyer broker commission as part of complying with Rule 11.2 that requires all

home sellers to make a blanket, unilateral and effectively non-negotiable offer of buyer broker

compensation.

79.   If Rule 11.2 was not in place, then the cost of buyer broker commissions would be

paid by their home buyer clients, and buyer brokers would have to compete with one another by

---

[27] *See* BAREIS MLS, Amended and Restated Bylaws of Bay Area Real Estate Information Services, Inc., pgs. 3-5 (Apr. 1, 2022), *available at* https://bareis.com/root-documents/forms/forms-1/rules-forms/619-bareis-bylaws/file.html.
[28] Rule 11.2 (Aug. 1, 2023), *available at* https://bareis.com/about/rules-and-regulations.html.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

offering a lower commission rate. This anticompetitive rule thereby restrains price competition among buyer brokers because the home buyer, who retains the buyer broker, is unable to negotiate or pay the commission for his or her broker.

80.    Rule 11.5 prevents a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer:

> A Buyer's Broker shall not use the terms of an offer to purchase a listed property that has been executed by or on behalf of a Buyer to secure an agreement to modify the MLS unilateral offer of compensation or the Buyer's Broker's right to receive such compensation from the Listing Broker. A Buyer's Broker also shall not make the submission to the Seller or to the Listing Broker of an executed offer to purchase the subject property contingent on an agreement to modify the offer of, or the right to receive such compensation. The Listing Broker shall not use a change in the terms or conditions of a compliant offer to purchase a listed property that has been submitted to the Listing Broker by a Buyer's Broker to attempt to modify the Listing Broker's unilateral offer of compensation or the Buyer's Broker's right to receive such compensation.[29]

81.    Pursuant to BAREIS MLS bylaws, Class A and C owners of BAREIS MLS are subject to having their membership terminated if they fail in a "material and serious degree" to observe BAREIS MLS's rules and regulations.[30] Accordingly, BAREIS MLS penalizes and discourages potential noncompliance with its anticompetitive rules, which include but are not limited to the Anticompetitive Broker Rules.

82.    Rules 11.2 and 11.5 are the functional equivalents of Section 2-G-1 and Standard Practice 16-16.

83.    Accordingly, the BAREIS MLS members who were franchisees and agents of the Brokerage Defendants adopted, implemented, and enforced anticompetitive restraints, including Rules 11.2 and 11.5, through their control of the BAREIS MLS board and its committees.

---

[29] *Id*. at Rule 11.5.

[30] *See* BAREIS MLS, Amended and Restated Bylaws of Bay Area Real Estate Information Services, Inc., pg. 6 (Apr. 1, 2022), https://bareis.com/root-documents/forms/forms-1/rules-forms/619-bareis-bylaws/file.html

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

**C.      Realtor Association Defendants**

84.      The Realtor Association Defendants are part-owners of BAREIS MLS.[31] They are affiliated with NAR, which requires that its members join a local realtor association prior to becoming a NAR member.

85.      NAR requires that Realtor Association Defendants fully comply with the anti-competitive rules detailed herein, and with other rules contained in the NAR Handbook and the NAR Code of Ethics. Furthermore, NAR reviews the governing documents of Realtor Association Defendants to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

86.      The Realtor Association Defendants are required to enforce the NAR Handbook and the NAR Code of Ethics' rules, policies, and practices on its members. Throughout the Class Period, the BAREIS MLS board, and virtually all committee members and broker owners were all NAR members, and members of at least one of the Realtor Association Defendants. Accordingly, the Realtor Association Defendants participated in the adoption, implementation, and enforcement of the anticompetitive rules.

**D.      The Brokerage Defendants**

87.      The Brokerage Defendants have agreed to adopt, implement, and enforce Section 2-G-1 by imposing NAR rules on their affiliated franchisees, brokers, and employees. By participating in an association which prevents members from allowing their associates to compete with one another for commissions, and by agreeing to follow and enforce these anticompetitive rules, Brokerage Defendants and NAR have joined the conspiracy and acted to further its implementation and enforcement.

88.      Brokerage Defendants implemented the conspiracy by requiring and/or encouraging their contractors, agents, subsidiaries, and franchisees (and by necessary implication, the subsidiaries' and franchisees' agents and realtors) to comply with NAR's rules.

89.      Upon information and belief, franchise agreements between the Corporate

---

[31] *Id.* at pgs. 3-5.

CLASS ACTION COMPLAINT

Defendants and their franchisees require those franchisees and their agents to: (a) comply with NAR's Code of Ethics; (b) join and comply with the rules of the local realtor association; and (c) participate in and comply with the rules of the local MLS, which include the mandatory rules in the NAR Handbook.

90.    Executives from Brokerage Defendants have actively participated in the management and operation of NAR. Indeed, senior executives of the Brokerage Defendants have served on NAR's governing board of directors. For example, Jason Gesing, Chief Industry Officer at eXP served as NAR Large Board Representatives. Executives of franchisees and other affiliates of the Corporate Defendants also dominated the 2018 eight-person Leadership Team that managed NAR's day-to-day operations. The immediate past President of NAR, Elizabeth Mendenhall, is the CEO of RE/MAX Boone Realty in Columbia, Missouri. Both NAR's Handbook and in its Code of Ethics were drafted, developed, and promulgated by NAR's board of directors or NAR's Professional Standards Committee. Brokerage Defendants use their leadership roles on the NAR to implement the conspiracy by reviewing NAR's Rules and agreeing to them at yearly meetings, and NAR further advances the conspiracy by re-issuing its rules.

91.    Because of Brokerage Defendants' agreements with their local franchisees and agents, their employee policy and procedures manuals, Brokerage Defendants' leadership roles in the NAR, and pressure from the Brokerage Defendants, local franchisees and agents located in the BAREIS Counties agreed to ensure that BAREIS MLS's rules contain the anticompetitive provisions, which are the functional equivalents of Section 2-G-1 and Standard Practice 16-16.

92.    The local franchisees and agents of the Brokerage Defendants participate in and implement the conspiracy by serving on the BAREIS MLS board and its committees, which adopt, implement, and enforce compliance with NAR rules.

93.    Consequently, each of the Brokerage Defendants received and continues to receive substantial sums of money in royalties or commission splits from the brokerage operations of their respective subsidiaries, franchisees, and/or affiliates that transact business in the BAREIS Counties.

/ / /

CLASS ACTION COMPLAINT

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

## <u>ANTICOMPETITIVE EFFECTS OF THE CONSPIRACY</u>

2      94.    Defendants' conspiracy has had the following anticompetitive effects throughout

3  the BAREIS Counties:

4               (a)    Home sellers paid inflated buyer-broker commissions and inflated total

5                      commissions.

6               (b)    Home sellers were forced to pay commissions to buyer brokers, thereby

7                      substantially inflating the cost of selling their homes.

8               (c)    Home sellers were compelled to set a high buyer-broker commission to

9                      induce buyer brokers to show their homes to the buyer brokers' clients.

10              (d)    The retention of a buyer broker was severed from the setting of the broker's

11                     commission; the home buyer retained the buyer broker, while the home

12                     seller's agent sets the buyer broker's compensation.

13              (e)    Price competition among brokers to be retained by home buyers was

14                     restrained, as was price competition among brokers seeking to be retained to

15                     sell homes.

16              (f)    Competition among home buyers was restrained by their inability to lower

17                     the buyer-broker commission.

18              (g)    Brokerage Defendants profited from inflated buyer-broker commissions and

19                     inflated total commissions.

20      95.    There are no pro-competitive effects of Defendants' conspiracy.

21      96.    Even if any alleged pro-competitive effects exist, they are substantially outweighed

22  by the anticompetitive effects of Defendants' conspiracy.

23      97.    Economic evidence shows that Defendants' conspiracy has resulted in inflated total

24  commissions and inflated buyer-broker commissions paid by home sellers, at levels above what

25  would be paid in a competitive market.

26      98.    Economists Natalya Delcoure and Norm Miller compared international real estate

27

28

commissions with those in the United States,[32] and concluded the following:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[33]

They also found variation within countries. For example, in the UK, they found that "1%-2% is typical" for total broker commissions, but that in "very competitive areas" the total rates ranged between "0.5-0.75%" whereas in lower priced areas the range was "as high as 3.5%."[34] Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[35]

99.    In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to the seller and buyer brokers) in the BAREIS Counties average between 5% and 6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and 3%. These numbers have remained stable despite both rising home prices and the decreasing role of the buyer broker during a time when many prospective home buyers have already scoured the market through online real estate marketplaces.

100.    Rule 11.2 encourages and facilitates anticompetitive steering away from brokers who deviate from the standard commission practices and rates. It enables buyer brokers to identify and compare the buyer-broker compensation offered by every seller and then steer their clients toward homes offering higher commissions.

101.    As confirmed by economic studies and literature, steering has clear anticompetitive effects. Steering deters reductions from the standard commission and enables brokers to avoid

---

[32]  *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).

[33]  *Id*. at 14.

[34]  *Id*. at 17.

[35]  *Id*. at 13.

CLASS ACTION COMPLAINT

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

doing business with, or to retaliate against, buyer brokers who try to compete by offering significant discounts.

102.    Defendants have further exacerbated the anticompetitive effects of steering by implementing the requirement that buyer broker commissions be specified in only certain ways (*i.e.*, a percentage of the sale price), which makes it easy for individual realtors or agents to see and compare offers.

103.    The economic evidence demonstrates that Defendants' conduct operates to restrain competition in several respects in real estate markets with the result being that home sellers pay far more than they otherwise would in a competitive market.

104.    Defendants' conspiracy was designed to raise and maintain real estate commissions at elevated and supra-competitive levels. Defendants provided uniform training to seller brokers to obtain commission rates in the 5% to 6% range, and to split commissions equally with buyer brokers. Because these commission offers are blanket offers and agreed to prior to listing the house, buyer brokers receive the same amount in commission regardless of the effort made, stifling competition.

105.    Despite significant changes in technology that should have substantially reduced commission charges, Defendants have managed to keep the standard real estate commission stabilized at around 5-6% throughout the Class Period.

## **MARKET POWER AND GEOGRAPHIC SCOPE OF BAREIS' MLS**

106.    Although MLSs exist throughout the United States, access to BAREIS MLS is critical for brokers to represent home buyers and sellers in connection with the sale and purchase of homes in the BAREIS Counties.

107.    Most homes sold in the BAREIS Counties were listed on BAREIS MLS by brokers that are subject to BAREIS MLS's rules and regulations. BAREIS touts itself as "the primary platform used by more than 60,000 real estate professionals to share information on properties for sale in Sonoma, Marin, Napa, Solano & Mendocino Counties."[36]

---

[36]  BAREIS MLS, About BAREIS – The Benefits of BAREIS MLS®, *available at* https://bareis.com/about/consumers-benefits.html

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

108.    Collectively, BAREIS and Brokerage Defendants provide a significant portion of the residential real estate broker services in these areas.

109.    Any buyer broker in the BAREIS Counties who wishes to compete outside of Defendants' conspiracy would face insurmountable barriers. Non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service.

110.    A seller's broker without access to BAREIS MLS would be unable to reach most potential buyers, and a broker who represented a buyer without using a listing service would lose access to most sellers. Brokers cannot compete effectively without access to an MLS and it is in the client's best interest to market a property on an MLS, subjecting it to the anticompetitive rules.

111.    For an alternative listing service to compete effectively with BAREIS MLS, it would need to have listings as comprehensive, or at least nearly so, as BAREIS MLS. However, brokers and their individual realtors or agents who currently profit from inflated buyer broker commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower total commissions and lower buyer broker commissions and seller broker commissions. Furthermore, many buyers would be reluctant to retain a buyer broker operating on an alternative listing service that required them to pay the buyer broker commission, when other buyer brokers operating on BAREIS MLS are entirely compensated by home sellers. Accordingly, seller brokers on an alternative listing service would struggle to attract buyer brokers and their buyer clients.

112.    Moreover, many home sellers would not retain brokers using a new and unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer brokers. Any listing service attempting to compete with BAREIS MLS would likely fail to attract enough property listings to operate profitably and be competitive. The absence of listing services that compete with BAREIS MLS reflects the very substantial barriers to entry.

**CONTINUOUS ACCRUAL**

113.    During the Class Period, the Defendants repeatedly charged buyer-broker commissions and total commissions that were inflated because of the conspiracy. These inflated

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1  commissions were paid by Plaintiff and Class members in connection with the sale of residential

2  real estate listed on BAREIS MLS, in the BAREIS Counties. Each payment of these inflated

3  commissions by Plaintiff and the other Class Members injured them and gave rise to a new cause

4  of action for that injury.

5       114.   During the Class Period, the Defendants have maintained, implemented, and

6  enforced the conspiracy in the BAREIS Counties.

7  **CLASS ACTION ALLEGATIONS**

8       115.   Plaintiff brings this action on behalf of herself and all others similarly situated, and

9  as a class action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3), on behalf of members

10  of the following Class ("the Class"):

11          All persons and entities in the United States who, from December 8,
12          2019, paid a buyer broker commission in connection with the sale of
        residential real estate listed on the BAREIS MLS.

13

14       116.   Excluded from the Class are Defendants, their officers, directors, and employees;

15  any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir

16  or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over

17  this action and the members of his/her/their immediate family and judicial staff, jurors, and

18  Plaintiffs' counsel and employees of their law firms.

19       117.   *Numerosity*. The members of the Class are so numerous as to render their individual

20  joinder impracticable. Although the precise number of Class members is unknown, based upon

21  information and belief Plaintiff alleges that the Class contains thousands of members. The true

22  number of Class members is known by Defendants, however, and, thus, may be notified of the

23  pendency of this action through electronic mail, first class mail and/or by published notice.

24       118.   *Adequacy of Representation*. Plaintiff will fairly and adequately protect the

25  interests of the Class. Plaintiff has retained trial counsel highly experienced in complex litigation

26  including complex antitrust class action litigation, and Plaintiff intends to vigorously prosecute this

27  action. Plaintiff has no interest in this action that is adverse or antagonistic to the interests of the

28  Class.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

119. ***Existence and Predominance of Common Questions of Law and Fact.*** Common questions of law and fact exist as to all members of the Class and predominate over any question affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

(a) Whether the Defendants knowingly participated in the conspiracy;

(b) Whether Defendants' conspiracy caused Plaintiff and Class members to pay inflated commissions;

(c) Whether the Plaintiff and Class members were injured as a result of Defendants' anticompetitive conduct;

(d) Whether Defendants' anticompetitive conduct was a material cause of Plaintiff's and Class members' injuries;

(e) Whether the injury can be measured using evidence common to the Class;

(f) Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

(g) Whether Defendants' conduct violates the UCL; and

(h) Whether Plaintiff and Class members are entitled to restitution and/or injunctive relief.

120. ***Typicality***. Plaintiff's claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Defendants and the relief sought within the Class is common to each member.

121. ***Superiority***. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

122.    Furthermore, the Class may be certified under Rule 23 (b)(2) because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class as a whole.

## ANTITRUST INJURY

123.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher total commissions and buyer broker commissions than they would have paid in the absence of Defendants' anticompetitive conduct, and as a result have suffered damages.

124.    There are no pro-competitive effects of Defendants' conduct that are not substantially outweighed by the anticompetitive effects.

125.    Economic evidence supports the conclusion that Defendants' anticompetitive conduct has resulted in Class members paying buyer-broker commissions and total commissions that have been inflated to supra-competitive levels above what they would be in a competitive market.

126.    Defendants' conduct was a material cause of the injuries sustained by Plaintiff and Class Members.

127.    The injuries sustained by Plaintiff and Class Members as a result of Defendants' conduct are injuries of the type that the antitrust laws were intended to prevent.

## FIRST CAUSE OF ACTION

### Violation of Section 1 of the Sherman Act
### 15 U.S.C. § 1

128.    Plaintiff repeats and incorporates by reference each paragraph above as if set forth in full herein.

129.    The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.

130.    Defendants engaged and are engaging in a contract, combination or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

131.    By adopting and implementing rules and regulations that require home sellers to agree to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation when listing a property on the BAREIS MLS, Defendants unlawfully restrain trade by:

(a)    requiring home sellers to pay a cost that, in a competitive market, would be paid by the buyer;

(b)    preventing a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer; and

(c)    causing home sellers to pay inflated commissions.

132.    The conspiracy alleged herein consists of a continuing agreement or understanding among Defendants to adopt, implement, and enforce rules and regulations for any realtor who lists a property for sale on the BAREIS MLS. These rules all home sellers to agree to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation when listing a property on the BAREIS MLS:

(a)    Rule 11.2 forces home sellers to pay a cost that, in a competitive market, would be paid by the buyer.

(b)    Rule 11.5 prevents a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer.

(c)    The Defendants restrain trade by enforcing policies and practices that artificially inflate commission rates.

133.    Defendants have restrained competition in the BAREIS Counties by adopting rules that require home sellers to pay: (1) buyer broker commissions, (2) inflated buyer-broker commissions, and (3) inflated total commissions. This harm to competition substantially outweighs any competitive benefits from the conspiracy.

134.    Defendants' unlawful restraint affects interstate commerce because certain of the Defendants who are participating in and profiting from the conspiracy are located outside of the State of California.

135.    Defendants' conspiracy has caused buyer-broker commissions and total

CLASS ACTION COMPLAINT

1    commissions in BAREIS Counties to be higher than they would have been but for the conspiracy.

2    Plaintiff and the other members of the Class paid these inflated commissions in connection with

3    the sale of residential real estate listed on BAREIS MLS in the BAREIS Counties. Absent

4    Defendants' conspiracy, Plaintiff and the Class members would have paid lower commissions.

5         136.    Defendants' agreement to restrain trade is a *per se* violation of Section 1 of the

6    Sherman Act.

7         137.    As a direct and proximate result of Defendants' past and continuing violation of

8    Section 1 of the Sherman Act, Plaintiff and the Class members have been injured in their business

9    or property in an amount to be proven at trial.

10                          **SECOND CAUSE OF ACTION**

11                       **Violation of the Cartwright Act**
     **California Business & Professions Code §§ 16720 *et. seq.***
12

13        138.    Plaintiff repeats and incorporates by reference each paragraph above as if set forth

14   in full herein.

15        139.    Defendants have engaged in conduct that was and continues to be an unreasonable

16   restraint of trade or commerce in violation of the Cartwright Act, California Business and

17   Professions Code §§ 16720 *et. seq.*

18        140.    By adopting and implementing rules and regulations that require home sellers to

19   agree to make a blanket, unilateral and effectively non-negotiable offer of buyer broker

20   compensation when listing a property on the BAREIS MLS, Defendants unlawfully restrain trade

21   by:

22             (a)    requiring home sellers to pay a cost that, in a competitive market, would be

23                    paid by the buyer;

24             (b)    preventing a buyer from seeking to reduce his, her, or their broker's

25                    commission by making that reduction a condition of a purchase offer; and

26             (c)    causing home sellers to pay inflated commissions.

27        141.    Defendants have unlawfully restrained competition in the BAREIS Counties by

28   adopting rules that require home sellers to pay: (1) buyer broker commissions, (2) inflated buyer-

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

broker commissions, and (3) inflated total commissions. Defendants' anticompetitive conduct constitutes a *per se* violation of California's antitrust law and is, in any event, an unreasonable and unlawful restraint of trade. The anticompetitive effects of Defendants' conduct far outweigh any purported non-pretextual, procompetitive justifications.

142.   Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer-broker commission and an inflated total commission, and has restrained price competition among buyer brokers in the BAREIS Counties. This harm to competition substantially outweighs any competitive benefits from the conspiracy.

143.   Defendants' unlawful restraint of trade has caused and continues to cause buyer-broker commissions and total commissions paid by home sellers in BAREIS Counties to be higher than they would have been but for the conspiracy, and thus substantially affects California commerce. Plaintiff and Class Members paid these inflated commissions in connection with the sale of residential real estate listed on BAREIS MLS

144.   Plaintiff and the Class members have suffered injury in fact and lost money because of Defendants violations of law and wrongful conduct, for which they seek damages (trebled where appropriate) including pre-judgment interest.

145.   Defendants' conduct is continuing and unless equitable relief is granted, artificially and anticompetitively inflated commission rates will continue unabated and cause harm.

## THIRD CAUSE OF ACTION

### Violation of California's Unfair Competition Law
### California Business and Professions Code §§ 17200, *et seq.*

146.   Plaintiff repeats and incorporates by reference each paragraph above as if set forth in full herein.

147.   Defendants' conduct constitutes unlawful and unfair business acts and practices within the meaning of California's Unfair Competition Law, California Business and Professions Code §§ 17200 *et. seq.* ("UCL").

148.   The UCL prohibits "any unlawful, unfair or fraudulent business act or practice…" Cal. Bus. & Prof. Code § 17200.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

149.   Defendants' acts or practices are unlawful because they violate, *inter alia*, the Sherman Antitrust Act and the California Cartwright Act.

150.   Defendants' acts and practices are unfair in that: (i) they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers; (ii) they harmed and continue to harm consumers in a manner far outweighing any legitimate utility of their conduct; (iii) the injury was not one that consumers reasonably could have avoided; and (iv) they were contrary to legislatively declared and public policy.

151.   Defendants financially benefited from their conduct to the financial detriment of Plaintiff and Class Members.

152.   As a direct and proximate result of Defendants' unlawful and unfair acts and practices, Plaintiff and Class members suffered substantial injury in fact, and lost money and/or property. The injuries suffered by the Plaintiff and Class members include, but are not limited to, paying higher total commissions and buyer broker commissions than they would have paid in the absence of Defendants' anticompetitive conspiracy.

153.   Defendants' conduct is continuing and unless injunctive relief is granted, artificially and anticompetitively inflated commission rates will continue unabated.

154.   Defendants thus have engaged in unlawful and unfair business acts and practices in violation of the UCL, entitling Plaintiff and the members of the Class to judgment and relief against Defendants as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and members of the Class, requests relief and prays for judgment against Defendants as follows:

(a)   An Order certifying the Class under the appropriate provisions of Rule 23 (b)(2) and (b)(3) of the Federal Rule of Civil Procedure;

(b)   An Order appointing Plaintiff as the Class representative and appointing her counsel as Class Counsel;

(c)   Declarations that the actions of Defendants, as set forth above, are unlawful and in violation of the Sherman Act, the Cartwright Act, and the UCL;

31

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1      (d)     An award to Plaintiff and the Class for actual damages trebled in an amount to be

2              determined at trial;

3      (e)     A permanent injunction under Section 16 of the Clayton Act enjoining Defendants

4              from (1) requiring that sellers pay the buyer broker, (2) continuing to restrict

5              competition among buyer brokers and seller brokers, and (3) engaging in any

6              conduct determined to be unlawful;

7      (f)     Appropriate injunctive relief under the UCL;

8      (g)     For restitution and restitutionary disgorgement of all monies wrongfully obtained

9              from Plaintiff and the Class by Defendants;

10     (h)     An award to Plaintiff and the Class of pre- and post-judgment interest;

11     (i)     An award to Plaintiff and the Class for their costs of suit, including reasonable

12             attorneys' fees and expenses; and

13     (j)     An award of such other relief as the Court may deem just and proper.

14     / / /

15     / / /

16     / / /

17     / / /

18     / / /

19     / / /

20     / / /

21     / / /

22     / / /

23     / / /

24     / / /

25     / / /

26     / / /

27     / / /

28     / / /

1

## DEMAND FOR JURY TRIAL

2      Plaintiff, on behalf of herself and all others similarly situated, hereby demands a jury trial of

3    all issues so triable.

4    DATED:  December 8, 2023                 **PEARSON WARSHAW, LLP**

5

6

7                                            By:  _____*/s/ Jill M. Manning*_____

8                                            JILL M. MANNING (Bar No. 178849)
                                             jmanning@pwfirm.com
9                                            **PEARSON WARSHAW, LLP**
10                                           555 Montgomery St., Suite 1205
                                             San Francisco, California 94111
11                                           Telephone: (415) 433-9000

12                                           DANIEL L. WARSHAW (Bar No. 185365)
                                             dwarshaw@pwfirm.com
13                                           BOBBY POUYA (Bar No. 245527)
                                             bpouya@pwfirm.com
14                                           NAVEED ABAIE (Bar No. 323338)
                                             nabaie@pwfirm.com
15                                           ERIC J. MONT (Bar No. 319592)
                                             emont@pwfirm.com
16                                           **PEARSON WARSHAW, LLP**
17                                           15165 Ventura Boulevard, Suite 400
                                             Sherman Oaks, California 91403
18                                           Telephone: (818) 788-8300

19                                           DOUGLAS MILLEN (*Pro Hac Vice* Forthcoming)
                                             dmillen@fklmlaw.com
20                                           ROBERT WOZNIAK (*Pro Hac Vice* Forthcoming)
                                             rwozniak@fklmlaw.com
21                                           MATTHEW RUAN (Bar No. 264409)
                                             mruan@fklmlaw.com
22                                           **FREED KANNER LONDON & MILLEN LLC**
23                                           100 Tri-State International, Suite 128
                                             Lincolnshire, IL  60069
24                                           Telephone:  (224) 632-4500

25                                           *Attorneys for Plaintiff Christina Grace and the*
26                                           *Proposed Class*

27

28

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111