1   JILL M. MANNING (Bar No. 178849)
       jmanning@pwfirm.com
2   **PEARSON WARSHAW, LLP**
3   555 Montgomery St., Suite 1205
    San Francisco, California 94111
4   Telephone: (415) 433-9000

5   DANIEL L. WARSHAW (Bar No. 185365)
       dwarshaw@pwfirm.com
6   BOBBY POUYA (Bar No. 245527)
       bpouya@pwfirm.com
7   NAVEED ABAIE (Bar No. 323338)
       nabaie@pwfirm.com
8   ERIC J. MONT (Bar No. 319592)
       emont@pwfirm.com
9   **PEARSON WARSHAW, LLP**
10  15165 Ventura Boulevard, Suite 400
    Sherman Oaks, California 91403
11  Telephone: (818) 788-8300

12  Attorneys for Plaintiff and the Proposed Class

13              **UNITED STATES DISTRICT COURT**

14           **NORTHERN DISTRICT OF CALIFORNIA**

15                  **OAKLAND DIVISION**

16  Christina Grace, Individually and on Behalf of      CASE NO. 4:23-cv-06352-HSG
    All Others Similarly Situated,
17                                                      **FIRST AMENDED CLASS ACTION
                                                        COMPLAINT**
18                  Plaintiff,
          v.                                            For Violations of:
19
    Bay Area Real Estate Information Services,          (1) The Sherman Act, 15 U.S.C. § 1;
20  Inc.; Marin Association of Realtors; North Bay      (2) The Cartwright Act, California Business
    Association of Realtors; Northern Solano            and Professions Code §§16720 *et seq.*;
21  County Association of Realtors, Inc.; Solano        (3) The Unfair Competition Law, California
    Association of Realtors, Inc.; RE/MAX               Business and Professions Code §§17200 *et*
22  Holdings, Inc.; Anywhere Real Estate Inc.;          *seq.*; and
    Vanguard Properties, Inc.; Twin Oaks Real           (4) Unjust Enrichment.
23  Estate Inc.; Windermere Real Estate Services
    Company Inc.; Rapisarda & Fox, Inc.; Realty         **DEMAND FOR JURY TRIAL**
24  ONE Group, Inc.; Keller Williams Realty,
    Inc.; Compass, Inc.; eXp World Holdings,            Judge: Haywood S. Gilliam, Jr.
25  Inc.; and DOES 1 through 50, inclusive,             Courtroom: 2, Fourth Floor
                                                        Action Filed: December 8, 2023
26
27                  Defendants.

28

1003028.1

*PEARSON WARSHAW, LLP*
*555 MONTGOMERY STREET, SUITE 1205*
*SAN FRANCISCO, CALIFORNIA 94111*

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

Plaintiff Christina Grace ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against the Defendants, and alleges as follows:

## NATURE OF THE LAWSUIT

1.      This is a class action brought by Plaintiff on behalf of all persons and entities that listed homes for sale on the Bay Area Real Estate Information Services, Inc. ("BAREIS MLS") in Marin, Mendocino, Napa, Solano, or Sonoma counties ("BAREIS Counties") and then paid buyer broker commissions in connection with the sales of those homes.

2.      Plaintiff and Class Members allege that during the four years prior to the filing of this action ("Class Period"), Defendants conspired and continue to conspire to restrain trade by causing Class Members to pay buyer broker fees and inflated commissions on home sales, in violation of Section 1 of the Sherman Act, the Cartwright Act, California Business and Professions Code §§ 16720 *et. seq,* and California's Unfair Competition Law, California Business and Professions Code §§ 17200 *et. seq.* ("UCL"). Plaintiffs further allege that Defendants were unjustly enriched as a direct result of the conduct described herein.

3.      Defendants are BAREIS MLS, the Realtor Association Defendants, and the following Brokerage Defendants: Vanguard Properties, Inc., Twin Oaks Real Estate Inc., Windermere Real Estate Services Company Inc., Rapisarda & Fox, Inc., Realty ONE Group, Inc., Compass, Inc., eXp World Holdings, Inc., Keller Williams Realty, Inc., Anywhere Real Estate Inc., and RE/MAX Holdings, Inc. (the Brokerage Defendants, BAREIS MLS, and the Realtor Association Defendants, are referred to collectively as "Defendants").

4.      A multiple listing service ("MLS") is a database of properties listed for sale in a particular geographic region and accessible to real estate brokers and their realtors[1] or agents that comply with the rules of the MLS.[2] BAREIS MLS is one such regional MLS, which operates and is available in the BAREIS Counties. Brokers that are members of an MLS are required to list all

---

[1] The term "realtor" or "REALTOR®" is both a trademark owned by NAR and a valuable membership benefit that distinguishes members from all others in the real estate business.

[2] *See* National Association of Realtors®, Handbook on Multiple Listing Policy (2023), *available at* https://cdn.nar.realtor/sites/default/files/documents/pdf_mls_handbook-2023-08-11.pdf?_gl=1*1am0u9c*_gcl_au*OTEyNDA1NDUzLjE2OTk5MTA5Nzc ("NAR Handbook").

properties on the MLS.

5.    The gravamen of Plaintiff's complaint is that anti-competitive BAREIS MLS rules, which Defendants agreed to, implemented, and enforced, require Class members to make a blanket, unilateral, and effectively non-negotiable offer of buyer broker compensation when listing a property on the BAREIS MLS.

6.    Unlike most MLSs in the United States, BAREIS MLS is not exclusively owned or operated by realtor associations affiliated with the National Association of Realtors ("NAR"). Rather, the Realtor Association Defendants share control of BAREIS MLS with its broker members, who are responsible for the adoption, implementation, and enforcement of the BAREIS MLS rules.

7.    Throughout the Class Period, BAREIS MLS adopted, implemented, and enforced BAREIS MLS Rule 11.2[3] ("Rule 11.2"), which requires all Class member home sellers to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation.

8.    Throughout the Class Period, BAREIS MLS adopted, implemented, and enforced BAREIS MLS Rule 11.5[4] ("Rule 11.5") which prevents buyers from seeking to reduce their own broker's commission as a condition of a purchase offer. BAREIS MLS rules 11.2 and 11.5 are referred to herein as the "Anticompetitive Broker Rules." Access to BAREIS MLS is conditioned on members' agreement to adopt and follow all BAREIS MLS rules, including the Anticompetitive Broker Rules.[5]

9.    These Anticompetitive Rules adopted by BAREIS MLS are the functional equivalents of Section 2-G-1 and Standard Practice 16-16 of the NAR Rules.[6]

10.    Defendants' conspiracy forces Class member home sellers to pay a cost that, in a competitive market, would be paid by the buyer. To gain the cooperation of buyer brokers, selling

---

[3] Rule 11.2 (Aug. 1, 2023), *available at* https://bareis.com/about/rules-and-regulations.html.

[4] Rule 11.5 (Aug. 1, 2023), *available at* https://bareis.com/about/rules-and-regulations.html.

[5] BAREIS MLS penalizes and discourages potential noncompliance with its anticompetitive rules. *See id.* at pg. 6.

[6] NAR MLS Handbook at Section 2-G-1 ("Section 2-G-1") and NAR's Code of Ethics, Standard Practice 16-16 ("Standard Practice 16-16")

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

brokers are also incentivized to offer a higher buyer broker commission as part of complying with rules that require all Class Members to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation.

11.     In a typical real estate transaction in the BAREIS Counties, different real estate brokers will represent the home seller and home buyer. Both the buyer broker and the seller broker are paid a percentage of a home's sales prices. Currently, total broker compensation in the United States is typically 5% to 6% of the home sales price.[7] Approximately, one half of that amount is paid to the buyer broker.[8] With housing costs in the BAREIS Counties sky-rocketing, these broker fees can easily amount to tens of thousands of dollars.[9]

12.     In a competitive market, sellers would pay nothing to buyer brokers, who would instead be paid by the buyers (their clients), and the total commission paid by a seller would be set at a level to compensate only the seller's broker. In a competitive market, buyer brokers would also compete with one another, including by potentially offering a lower commission rate. The anticompetitive rules adopted by BAREIS  restrain price competition among buyer brokers because the home buyer that retains the buyer broker does not negotiate or pay any commission to his or her broker.

13.     In competitive foreign markets, including the United Kingdom, Germany, Israel, Australia, and New Zealand, if home buyers decide to use a broker, they (rather than home sellers) pay that broker less than half the rate paid to buyer brokers in California.

14.     A 2015 report commissioned by NAR to study negative emerging trends in the real estate industry highlighted concerns that total commissions in the United States are inflated compared to various international markets. According to this report, the average total commissions

---

[7] *See* Anna Bahney, *Why are real estate commissions 6%? – and why that may be changing*, CNN (Dec. 3, 2023), *available at* https://finance.yahoo.com/news/why-real-estate-commissions-6-225830372.html

[8] *Id.*

[9] According to Zillow, the median home price in Marin County, where Plaintiff sold her home in 2020, is just over $1.4 million. www.zillow.com/home-values/625/marin-county-ca. Thus, the average broker commission on such a sale would be $70,000 – $84,000.

1   range between 1% and 3% in countries such as the United Kingdom, Singapore, the Netherlands,

2   Australia, and Belgium.[10]

3        15.    Many home buyers no longer require the help of a broker to search for prospective

4   homes. Instead, buyers can start their search process by using online services such as Zillow or

5   Redfin and are increasingly retaining a buyer broker after having already found a target home.

6        16.    Despite the diminishing role of buyer brokers, commissions for buyer brokers have

7   held steady in the 2.5% to 3% range because of conspiracy alleged herein. Furthermore, because

8   housing prices significantly increased during the Class Period, and because commissions are

9   calculated as a percentage of the home's sales price, the actual dollar amounts of buyer

10   commissions substantially increased during the Class Period. Thus, the dollar amount of

11   commissions is increasing at the same time the work done by buyer brokers is decreasing.

12        17.    Although transaction costs are dramatically decreasing in other sectors and

13   industries that benefit from technological advances, real estate commission rates have persisted in

14   the 5% to 6% range. Defendants provide uniform training to seller brokers to maintain such rates

15   and to split commissions roughly equally with buyer brokers. Because these commissions are set

16   via blanket offers agreed to prior to a home being listed, buyer brokers receive the same percentage

17   amount regardless of their efforts, thereby stifling competition.

18        18.    Because buyer brokers will not show homes to their clients where the seller broker

19   is offering a lower buyer-broker commission or will show such homes later in the search process,

20   seller brokers face pressure in making their unilateral blanket offers to provide high commissions

21   to buyer brokers.

22        19.    Moreover, in the absence of Defendants' anticompetitive restraints, seller brokers

23   would likely face additional competitive pressures. Instead of following the long-time practice of

24   setting total commissions at or near 6%, and assigning roughly half of that amount to themselves

25   and roughly the other half to the buyer broker (and selecting that amount at a level to remain in the

26

27   _____
[10]   Swanepoel Group, D.A.N.G.E.R Report, at 22 (definitive analysis of negative game changers

28   emerging in real estate) (2015). The report also suggests that total commissions in Germany range
      between 3% and 6%.

good graces of buyer brokers), seller brokers would set a commission to pay themselves alone and would likely begin to engage in more vigorous competition with one another to lower their rates and/or provide additional services to justify their rates.

20.    Another powerful and destructive effect in the marketplace that results from and is amplified by Defendants' anticompetitive conduct is the practice of steering. Given the requirement that seller brokers make a blanket and unilateral offer of commission to buyer brokers, buyer brokers face strong incentives to steer their buyer clients toward homes where the buyer broker would receive a higher commission. Steering is a key reason why agent commissions remain high in the United States during the internet era, even as commissions in other countries have plummeted. Economic studies and literature document and confirm the prevalence and significance of steering.[11] A recent academic study found systematic and nationwide evidence that buyer agents steer clients away from properties that offer low buyer agent commissions.[12]

21.    Each of the Realtor Association Defendants are members of BAREIS MLS. As members of BAREIS MLS, they have significant voting power in electing the BAREIS Board of Directors.

22.    Each of the Realtor Association Defendants are affiliated with NAR, which requires that its members join a local realtor association. The Realtor Association Defendants agreed to enforce the NAR Handbook and the NAR Code of Ethics rules, policies, and practices on its members when they applied to be a new member Association of NAR. In fact, the primary objective of the Realtor Association Defendants was "to promote and maintain high standards of conduct in the real estate profession as expressed in the Code of Ethics of N.A.R."

23.    The Brokerage Defendants effectuated the conspiracy through their control of the BAREIS Board of Directors and the Realtor Association Defendants. The Brokerage Defendants had numerous representatives on the BAREIS Board of Directors, the BAREIS committees, and

---

[11] *See* Roger P. Alford & Benjamin H. Harris, *Anticompetition in Buying and Selling Homes*, Cato Institute (2021), *available at* www.cato.org/regulation/summer-2021/anticompetition-buying-selling-homes.

[12] *See* Jordan Barry, Will Fried & John William Hatfield, *Et Tu, Agent? Commission-Based Steering in Residential Real Estate* (Oct. 9, 2023), *available at* https://ssrn.com/abstract=4596391.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

the boards and executive teams of the Realtor Association Defendants.

24. The Brokerage Defendants' local franchisees and their agents participate in and implement the conspiracy by serving on the BAREIS Board of Directors, BAREIS MLS committees, and boards of the Realtor Association Defendants which adopt, implement, and enforce compliance with the Anticompetitive Broker Rules.

25. Each Brokerage Defendant also mandates that its franchisees, brokerages, and individual realtors join NAR and implement NAR's rules to receive the benefit of the Brokerage Defendants' branding, infrastructure, and general support. The Brokerage Defendants' local franchisees and agents located in the BAREIS Counties agreed to ensure that BAREIS MLS's rules contain the Anticompetitive Broker Rules because of, among other things, employee policy and procedures manuals, the Brokerage Defendants' leadership roles in NAR, and pressure from the Brokerage Defendants.

26. By agreeing to adopt, implement, and enforce the Anticompetitive Broker Rules, the Defendants participated in a conspiracy to restrain trade by requiring Class members to pay the broker representing the buyer of their homes, and to pay inflated commissions.

27. Defendants' conspiracy inflated buyer broker commissions, which in turn inflated the total commissions paid by Class members. Plaintiff and Class Members each incurred, on average, thousands of dollars in overcharges and damages due to Defendants' conspiracy.

28. In sum, the conspiracy had and continues to have multiple harmful and anticompetitive effects, including: (a) requiring Class members to pay for services provided by buyer brokers to the buyer; (b) raising and stabilizing buyer broker compensation at levels higher than they would be in a competitive marketplace; and (c) encouraging and facilitating steering and other actions that impede innovation and entry by new and lower-cost real estate brokerage service providers.[13]

---

[13] This lucrative broker commission system is currently facing antitrust scrutiny by the Antitrust Division of the United States Department of Justice. *See* Jordan Yadoo and Leah Nylen, *Real Estate Brokers Pocketing Up to 6% in Fees Draw Antitrust Scrutiny*, Bloomberg (2023), *available at* www.bloomberg.com/news/articles/2023-10-16/us-realtors-lucrative-fee-system-faces-mounting-antitrust-risk#xj4y7vzkg.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

## JURISDICTION AND VENUE

29.     This Court has federal question jurisdiction pursuant to the federal antitrust laws invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

30.     This Court also has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from Defendants.

31.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to the claims occurred in this District.

32.     Assignment to the Oakland Division of this district is appropriate under Civil Local Rule 3-2(d).

## PARTIES

**A.     Plaintiff**

33.     Plaintiff Christina Grace is a resident and citizen of the State of California. Plaintiff sold her home located in Marin County, California, in April 2020. Plaintiff's home was listed for sale on the BAREIS MLS. Upon closing the sale of her home, Plaintiff paid a $29,358 commission to the listing agent (3.5% of the sale price) and a $20,970 commission to the buyer agent (2.5% of the sale price), for a total of $50,328.

34.     As set forth in this Complaint, Defendants' unlawful conduct and conspiracy caused Plaintiff to pay a buyer-broker commission and artificially increased the amount of the total commission to a rate higher than it would have been in a competitive market.

**B.     Defendants**

35.     Defendant BAREIS MLS is a broker-controlled multiple listing service serving real estate professionals throughout Marin, Sonoma, Napa, Solano and Mendocino counties in Northern

California.[14] There are three main classes of BAREIS MLS members:[15] 1) Class A: "Any natural person or entity who or which is duly licensed as an active real estate broker" in one of the BAREIS Counties; 2) Class B: the Marin Association of REALTORS®, the North Bay Association of REALTORS®, the Northern Solano Association of REALTORS®, and the Solano Association of REALTORS®; and 3) Class C: "Any natural person who is not a Class A Member but who is duly licensed with the California Department of Real Estate" in one of the BAREIS Counties.

36.    Defendant Marin Association of REALTORS® ("MAR") is affiliated with NAR and is a member of Defendant BAREIS MLS. MAR, founded in 1920, is headquartered in San Rafael, California. Members of MAR are obligated to conduct themselves and their businesses in accordance with MAR's rules, regulations, constitution, and bylaws, the MLS rules and the bylaws, and the NAR constitution.

37.    Defendant North Bay Association of REALTORS® ("NorBAR") is affiliated with NAR and is a member of Defendant BAREIS MLS. NorBAR is headquartered in Santa Rosa, California. NorBAR is a 3,000 plus member, four county trade association with members in Sonoma County, Napa County, Lake County, and the 101 corridor in Mendocino County.

38.    Defendant Northern Solano Association of REALTORS® ("NSAR") is affiliated with NAR and is a member of Defendant BAREIS MLS. NSAR is headquartered in Fairfield, California. Upon information and belief, NSAR is a professional trade association servicing nearly 1,500 realtors in the Northern Solano County.

39.    Defendant Solano Association of REALTORS® ("SAR") is affiliated with NAR and is a member of Defendant BAREIS MLS. SAR is headquartered in Vallejo, California.

40.    Defendant RE/MAX Holdings, Inc. ("RE/MAX") is one of the nation's largest real estate brokerages. It is headquartered in Denver, Colorado. RE/MAX is publicly traded and has a market value of approximately one billion dollars. It franchises local RE/MAX brokers around the

---

[14]  BAREIS MLS, About BAREIS, *available at* https://bareis.com/about/bareis.html

[15]  BAREIS MLS, Amended and Restated Bylaws of Bay Area Real Estate Information Services, Inc., pgs. 3-5 (Apr. 1, 2022), *available at*  https://bareis.com/root-documents/forms/forms-1/rules-forms/619-bareis-bylaws/file.html.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1   country, which have approximately 6,800 offices and more than 100,000 sales associates. RE/MAX

2   franchises in and transacts substantial business in California, including in this District.

3       41.    Defendant Anywhere Real Estate Inc., formerly known as Realogy Holdings Corp.

4   ("Anywhere Real Estate") is the nation's largest real estate brokerage company. Headquartered in

5   Madison, NJ, Anywhere Real Estate is a publicly traded corporation with a market value of over

6   $4 billion. It owns, operates, and franchises real estate brokerage firms, including Century 21,

7   Coldwell Banker, Sotheby's International Realty, The Corcoran Group, Better Homes and Garden

8   Real Estate, ZipRealty, ERA Real Estate, Citi Habitats, and Climb Real Estate. Anywhere Real

9   Estate franchises in and transacts substantial business in California, including in this District.

10      42.    Defendant Vanguard Properties, Inc. ("Vanguard") is a real estate company

11  operating throughout the counties of Marin, Sonoma, Napa, San Francisco, East Bay, and Palm

12  Springs with approximately 400-500 agents. Vanguard is headquartered in San Francisco,

13  California, and transacts substantial business in this District.

14      43.    Defendant Twin Oaks Real Estate, Inc. ("Twin Oaks"), is a real estate company

15  founded in 2008 and headquartered in Solano County. Twin Oaks operates throughout Solano and

16  Contra Costa counties. Twin Oaks has approximately 100 agents and transacts substantial business

17  in this District.

18      44.    Windermere Real Estate Services Company, Inc. ("Windermere") is  a real estate

19  company headquartered in Seattle, Washington. It is the largest regional company in the Western

20  United States with over 300 offices and 6,500 agents. Windermere or its franchisees transact

21  substantial business in this District.

22      45.    Defendant Rapisarda & Fox, Inc., doing business as Realty ONE Group FOX

23  ("Fox"), is a real estate brokerage, established in 2018, and is a franchise or affiliate of Realty ONE

24  Group, Inc.  With two offices in Vacaville and Santa Rosa, Fox transacts substantial business in

25  this District. Fox further operates in the Northern San Francisco Bay Area, Solano County, Napa

26  County, Sonoma County, and Yolo County. The company has  approximately 100 agents.

27      46.    Defendant Realty ONE Group, Inc. is a real estate brokerage and franchising

28  company headquartered in California and incorporated in Nevada. The company operates in 49

1   states, Washington D.C., and sixteen countries and territories with over 19,000 agents. The

2   company and/or its franchisees transacts substantial business in this district.

3       47.     Defendant Keller Williams Realty, Inc. ("Keller Williams") is one of the nation's

4   largest real estate brokerages. Headquartered in Austin, Texas, Keller Williams is a privately held

5   company. It franchises local Keller Williams brokers around the country, which have

6   approximately 700 offices and more than 120,000 sales associates. Keller Williams franchises in

7   and transacts substantial business in California, including in this District.

8       48.     Defendant Compass, Inc. ("Compass") is a publicly traded company incorporated

9   in Delaware with its principal place of business in New York. The company's stock began trading

10  on the New York Stock Exchange after its initial public offering in April 2021. Through 2022,

11  Compass represented sellers or buyers in more than 700,000 transactions totaling more than $780

12  billion in gross transaction value. Compass franchises in and transacts substantial business in

13  California, including in this District.

14      49.     Defendant eXp World Holdings, Inc. ("eXp") is a publicly traded company

15  incorporated in Delaware with its principal place of business in Bellingham, Washington. eXp

16  offers the bulk of its real estate brokerage services through its subsidiary, eXp Realty, LLC. eXp

17  has residential real estate brokerages in all 50 states. For the year ending December 31, 2022, eXp's

18  agent count exceeded 86,000 and the company provided brokerage services for over 511,000

19  transactions. eXp franchises in and transacts substantial business in California, including in this

20  District. As used herein, the term "eXp" refers collectively to eXp World Holdings, Inc. and eXp

21  Realty, LLC.

22      50.     Doe Defendants 1-50 are members of the conspiracy alleged herein whose identities

23  are presently unknown to Plaintiff. These include, among other entities, other local realtor

24  associations and real estate brokers who agreed to implement the Anticompetitive Broker Rules

25  when listing homes for sale on BAREIS MLS. Plaintiff expects that the identity of these Doe

26  Defendants will be revealed during discovery, at which point Plaintiff will seek leave to amend her

27  complaint to add those entities in place of the Doe Defendants.

28  ///

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

**C.      NAR and Unnamed Co-Conspirators**

51.      In addition to the named Defendants, NAR participated as a co-conspirator in the conduct alleged in this Complaint.

52.      NAR requires its members that own and operate an MLS to comply with the mandatory provisions in the NAR Handbook and Code of Ethics.

53.      NAR requires local realtor associations to monitor their MLS and its participants to ensure that they comply with the mandatory provisions of the NAR Handbook.

54.      Failure to strictly comply with the Code of Ethics can lead to expulsion from NAR:

> Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association.[16]

55.      If a broker or agent was denied access to a local MLS, then that broker and its agents would not be able to list properties for sale in the database or receive offers of compensation for finding a buyer for a listed property.

56.      NAR's model rules for local realtor associations also require adherence to NAR's Code of Ethics.

57.      NAR further penalizes and discourages potential non-compliance with its anticompetitive rules by withholding professional liability insurance from any associations operating under any bylaws or rules that are not approved by NAR.[17] NAR's position and monitoring of potential non-compliance includes conduct to oversee and monitor realtor associations and MLSs.

58.      NAR reviews the governing documents of its local realtor associations to ensure compliance with NAR rules. NAR further requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

59.      NAR previously took actions to stifle innovation and competition among real estate

---

[16] National Association of Realtors®, Code of Ethics and Arbitration Manual 2019, at 1, *available at* https://www.nar.realtor/sites/default/files/documents/2019-CEAM.pdf.
[17] NAR Handbook, at 8.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1    brokers, including actions that led to the United States Department of Justice Antitrust Division

2    filing a lawsuit to enjoin a NAR "policy that obstruct[ed] real estate brokers who use innovative

3    Internet-based tools to offer better services and lower costs to consumers." NAR ultimately agreed

4    to a final judgment requiring that it modify and abandon the challenged policy.[18] This lawsuit

5    illustrates NAR's history of formulating, adopting, and enforcing anticompetitive policies that stifle

6    innovation and restrain competition in violation of federal law.

7           60.    In addition to the named Defendants, other local realtor associations and real estate

8    brokers participated as co-conspirators in the violations alleged herein and performed acts and made

9    statements in furtherance thereof. Specifically, nearly all who own, operate, and participate in

10   BAREIS MLS agree to, comply with, and implement the Anticompetitive Broker Rules.

11          61.    Various persons and/or firms not named as Defendants herein may have participated

12   as co-conspirators in the violations alleged herein and may have performed acts and made statements

13   in furtherance thereof.

14          62.    Defendants are jointly and severally liable for the acts of their co-conspirators,

15   whether or not those co-conspirators are named as Defendants in this Complaint.

16                                    **FACTUAL ALLEGATIONS**

17   **I.     Real Estate Industry Background**

18          63.    State licensing laws regulate who can represent buyers and sellers in real estate

19   transactions. There are two categories of licensees: (1) the real estate broker, also known as a

20   "brokerage firm," and (2) the individual real estate licensee or agent. Brokerage firms license

21   individual real estate realtors or agents and are legally responsible for the actions of their licensed

22   realtors or agents.

23          64.    Licensed brokers are the only entities permitted by state law to be paid for

24   representing buyers or sellers in a real estate transaction. This explains why real estate brokerage

25   contracts with sellers and buyers are required to be with brokers, not agents, and all payments to

26

27   _____

28   [18] *See* www.justice.gov/archive/atr/public/press_releases/2005/211008.htm; *see also*
     www.justice.gov/atr/case-document/final-judgment-142.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

individual realtors or agents pass through the brokers.

65.     Most brokers and their individual realtors or agents occupy dual roles: a broker may act as a seller broker for some home sales and as a buyer broker for other home sales.

66.     According to NAR, 89% of sellers sold their home with the assistance of a real estate agent in 2023, and 89% of buyers purchased their home with the assistance of a real estate agent or broker in 2023.[19]

67.     In typical residential real estate transactions, real estate brokers and agents receive their compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home is sold.

68.     A seller broker's compensation is set forth in a listing agreement, a contract between the seller and the seller broker. The listing agreement includes the terms of the listing and often provides that the seller broker has the exclusive right to market the seller's home.

69.     Home buyers retain brokers pursuant to written contracts that typically disclose that the buyer broker will be compensated by receiving a commission from the seller. The seller broker then pays the buyer broker a commission out of the total commission paid by the seller in connection with the home sale.

70.     Like the BAREIS rule, the NAR Handbook and Code of Ethics require residential real estate Sellers to make a blanket, unilateral, and effectively non-negotiable offer of compensation to any Buyer's Broker whenever listing a home on any MLS owned or controlled by a local NAR association. If a buyer, represented by a Buyer's Broker, purchases residential real estate, under such a non-negotiable offer of compensation, then the Buyer Broker receives the offered compensation as outlined in the listing agreement. This is described in the NAR Handbook Section 2-G-1 which provides, in relevant part:

> In filing a property with the multiple listing service of an association of Realtors®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the

---

[19]  National Association of Realtors®, Highlights From the Profile of Home Buyers and Sellers (2023), *available at* www.nar.realtor/research-and-statistics/research-reports/highlights-from-the-profile-of-home-buyers-and-sellers

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

compensation being offered to the other MLS participants.[20]

71.     The NAR Handbook further states that "[m]ultiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[21]

72.     The NAR Board of Directors, and the committees reporting to it, determines from time to time whether to modify any policies in the NAR Handbook and has approved certain changes in recent years.

73.     Section 2-G-1 shifts a cost to the seller that would otherwise be paid by the buyer in a competitive market. As *The Wall Street Journal* opined, the result is that home sellers are effectively required to hire a buyer broker if they wish to list their home on an MLS, which requires the services of a seller broker, and that this system is a violation of "the Sherman Anti-Trust [sic] Act that keeps buying agents paid though they offer almost no useful services."[22]

74.     Moreover, Section 2-G-1's requirement that the seller broker make a blanket, unilateral offer provides an incentive for seller brokers to cooperate with buyer brokers by offering a high commission for the buyer broker. Brokers often act as a selling broker in one transaction but as a buyer broker in another, which further contributes to the anticompetitive effects of the rule in that it fosters an environment in which brokers work cooperatively to split a total commission, instead of openly competing to earn the business of both potential home sellers and potential home buyers based solely on the services to be provided to that represented party.

75.     To foreclose the possibility that a buyer might seek to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer, NAR adopted Standard Practice 16-16:

REALTORS, acting as subagents or buyer/tenant representatives or

---

[20] NAR Handbook, at 69.

[21] *Id*., at 40.

[22] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), *available at* www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

> brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[23]

In other words, a buyer-broker offer to a seller that is conditional on the seller reducing the buyer-broker commission expressly violates NAR's ethics rules.

76.     In 2019, a class action was filed against NAR and real estate brokers in the Western District of Missouri alleging that NAR rules violate the Sherman Act by inflating home seller commission rates. *Sitzer v. Nat'l Ass'n of Realtors*, Civil Action No. 4:19-cv-00332 (W.D. Mo. 2019). The motion to dismiss that case was denied in October 2020, and the class was certified in April 2022.

77.     On December 16, 2022, the court denied the motions for summary judgment and trial commenced on October 16, 2023.

78.     Prior to the trial, Defendants Anywhere Real Estate Inc. and RE/MAX Holdings, Inc. reached settlements with Plaintiffs for $83.5 million and $55 million, respectively.

79.     The case proceeded to trial and, on October 31, 2023, a jury found that a conspiracy existed among Defendants NAR, HomeServices of America, BHH Affiliates, HSF Affiliates, Keller Williams Realty, Anywhere Real Estate, and RE/MAX LLC to follow and enforce the NAR's rules, that the conspiracy had the effect of raising, inflating or stabilizing broker commission rates paid by home sellers in violation of the Sherman Act and that the class plaintiffs paid more for real estate brokerage services than they would have absent the conspiracy.

80.     The jury awarded the class plaintiffs over $1.7 billion in damages.

___
[23]  National Association of Realtors®, Code of Ethics and Standard of Practice (Jan. 1, 2023), *available at* https://cdn.nar.realtor/sites/default/files/documents/2023-coe-standards-of-practice-2022-12-28.pdf?_gl=1*1lnx2bs*_gcl_au*MTMwMTE3OTY5NC4xNjk5MDc2ODI2

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1

2

**II.    Defendants Knowingly Participated in the Adoption, Implementation, and Enforcement of the Anticompetitive Rules**

3

**A.    BAREIS MLS**

4

81.    The BAREIS MLS is "a means by which (a) authorized Broker Participants

5

establish legal relationships with other Broker Participants by making blanket unilateral contractual

6

offers of compensation and cooperation to other Broker Participants …".

7

82.    Unlike most MLSs in the United States, BAREIS MLS is not exclusively owned or

8

operated by realtor associations.[24] As such BAREIS is not a NAR affiliated MLS, and its rules are

9

not identical to such MLSs.

10

83.    BAREIS MLS operates pursuant to rules adopted in October 1998, and revised on

11

August 1, 2023.

12

84.    The Brokerage Defendants or their franchisees, along with their agents and brokers,

13

are members of BAREIS MLS. As such, the Brokerage Defendants agreed to adhere to the BAREIS

14

MLS rules.

15

85.    Access to BAREIS MLS is conditioned on members' agreement to follow the

16

BAREIS MLS rules, including but are not limited to Rules 11.2 and 11.5.

17

86.    Rule 11.2 states that:

18

> By submitting a listing in the MLS Data, the Listing Broker is making a blanket, unilateral contractual offer of compensation, if any, to the other Broker Participants and, through the Broker Participants, other Members, for their service in selling the property. This offer of compensation, if any, is also made to members of organizations that are parties to the Cross Pollination Agreement. A Listing Broker shall specify the compensation, if any, in a dollar amount, as a percentage of the sales price, or other consideration, to be paid to a Buyer's Broker.[25]

19

20

21

22

23

///

24

///

25

26

---

27

[24] *See* BAREIS MLS, Amended and Restated Bylaws of Bay Area Real Estate Information Services, Inc., pgs. 3-5 (Apr. 1, 2022), *available at* https://bareis.com/root-documents/forms/forms-1/rules-forms/619-bareis-bylaws/file.html.

28

[25] Rule 11.2 (Aug. 1, 2023), *available at* https://bareis.com/about/rules-and-regulations.html.

87.     Rule 11.2 forces Class Members to pay a cost that in a competitive market would instead be paid by the buyer. To gain the cooperation of buyer brokers, selling brokers are also incentivized to offer a higher buyer broker commission as part of complying with Rule 11.2 that requires all home sellers to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation.

88.     If Rule 11.2 was not in place, then the cost of buyer broker commissions would be paid by their home buyer clients, and buyer brokers would have to compete with one another by offering a lower commission rate. This anticompetitive rule thereby restrains price competition among buyer brokers because the home buyer, who retains the buyer broker, is unable to negotiate or pay the commission for his or her broker.

89.     Rule 11.5 prevents a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer:

> A Buyer's Broker shall not use the terms of an offer to purchase a listed property that has been executed by or on behalf of a Buyer to secure an agreement to modify the MLS unilateral offer of compensation or the Buyer's Broker's right to receive such compensation from the Listing Broker. A Buyer's Broker also shall not make the submission to the Seller or to the Listing Broker of an executed offer to purchase the subject property contingent on an agreement to modify the offer of, or the right to receive such compensation. The Listing Broker shall not use a change in the terms or conditions of a compliant offer to purchase a listed property that has been submitted to the Listing Broker by a Buyer's Broker to attempt to modify the Listing Broker's unilateral offer of compensation or the Buyer's Broker's right to receive such compensation.[26]

90.     Pursuant to BAREIS MLS bylaws, Class A and Class C members of BAREIS MLS are subject to having their membership terminated if they fail in a "material and serious degree" to observe BAREIS MLS's rules and regulations.[27] Accordingly, BAREIS MLS penalizes and

---

[26] *Id*. at Rule 11.5.

[27] *See* BAREIS MLS, Amended and Restated Bylaws of Bay Area Real Estate Information Services, Inc., pg. 6 (Apr. 1, 2022), https://bareis.com/root-documents/forms/forms-1/rules-forms/619-bareis-bylaws/file.html

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1   discourages potential noncompliance with its anticompetitive rules, which include but are not

2   limited to the Anticompetitive Broker Rules.

3       91.     The "Class A" Membership application form for BAREIS states:  "The Applicant

4   shall require all agent or broker licensees who are employed by or affiliated as independent

5   contractors with the Applicant and are using the BAREIS MLS® services to comply with the

6   Bylaws and the Rules."

7       92.     A BAREIS orientation presentation states: "The organization is governed by a

8   board of directors, elected by the membership and made up of BAREIS members. Each year

9   BAREIS holds a general election. Principal Brokers (class A members) can run for a seat on the

10  board. Associate Brokers and Sales agents (class C members) can gain a seat on the board if

11  nominated by the Marin, Napa, Sonoma or Solano County Association of REALTORS®."

12      93.     Accordingly, BAREIS MLS, through its Board of Directors, agreed to and did

13  adopt, implement, and enforce the Anticompetitive Broker Rules, including Rules 11.2 and 11.5.

14  **B.    Realtor Association Defendants**

15      94.     The Realtor Association Defendants are members of BAREIS MLS.[28] As members

16  of the BAREIS MLS, and by and through their members, the Realtor Association Defendants have

17  been involved in the adoption, implementation, and enforcement of the Anticompetitive Broker

18  Rules, including Rules 11.2 and 11.5.

19      95.     The Realtor Association Defendants are affiliated with NAR, which requires that its

20  members first join a local realtor association.

21      96.     NAR requires that Realtor Association Defendants fully comply with the NAR

22  Handbook and the NAR Code of Ethics. Furthermore, NAR periodically reviews the governing

23  documents of Realtor Association Defendants to demonstrate their compliance with these rules.

24      97.     The Realtor Association Defendants agreed to follow and enforce the NAR

25  Handbook and the NAR Code of Ethics' rules, policies, and practices on its members when they

---

[28]  *Id*. at pgs. 3-5.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

applied to be a new member Association of NAR. The Realtor Associations perpetuated the conspiracy by requiring their members to comply with the Code of Ethics as a condition to membership.

98.     Additionally, the Realtor Association Defendants actively participated in the enforcement of the conspiracy through disciplinary proceedings, orientation training regarding the Code of Ethics, and continuing education regarding the Code of Ethics. In fact, the primary objective of the Realtor Association Defendants was "to promote and maintain high standards of conduct in the real estate profession as expressed in the Code of Ethics of N.A.R." The Board of Directors, who served three-year terms, were tasked with voting on membership eligibility of an applicant and enforcing the Code of Ethics by administering penalties for violations thereof. The Realtor Association Defendants operated "MLS Service Centers" that provide membership and administrative services to BAREIS MLS members.

99.     The Realtor Association Defendants were members of BAREIS and therefore had significant voting power in electing the Board of Directors of BAREIS, including but not limited to possessing the exclusive right to nominate Class C members to run for a director position.

100.     Throughout the Class Period, nearly all BAREIS MLS Board members, committee members, and broker owners were also members of NAR and the Realtor Association Defendants.

101.     Through their membership in both NAR and the Realtor Association Defendants, the BAREIS Board of Directors and committee members agreed to adopt and enforce the Code of Ethics as a condition to membership. Accordingly, the Realtor Association Defendants participated in the adoption, implementation, and enforcement of the Anticompetitive Broker rules.

C.     **The Brokerage Defendants**

102.     As a condition to membership, the Brokerage Defendants agreed to adopt, implement, and enforce the Anticompetitive Broker Rules when they became members of BAREIS MLS.

103.     The local franchisees and agents of the Brokerage Defendants participate in and implement the conspiracy by serving on the BAREIS MLS board and its committees, which adopt, implement, and enforce compliance with Anticompetitive Broker Rules.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

104.    Additionally, the Brokerage Defendants effectuated the conspiracy through its control of the Board of Directors and officers of the Realtor Association Defendants. The Brokerage Defendants had numerous representatives on the Board of Directors and executive team for the Realtor Association Defendants.  They were instrumental in adopting and enforcing the Anticompetitive Broker Rules.

105.    Consequently, each of the Brokerage Defendants received and continues to receive substantial sums of money in royalties or commission splits from the brokerage operations of their respective subsidiaries, franchisees, and/or affiliates that transact business in the BAREIS Counties.

106.    The Brokerage Defendants have further agreed to adopt, implement, and enforce Section 2-G-1 by imposing NAR rules on their affiliated franchisees, brokers, and employees. By participating in an association which prevents members from allowing their associates to compete with one another for commissions, and by agreeing to follow and enforce these anticompetitive rules, the Brokerage Defendants joined the conspiracy and acted to further its implementation and enforcement.

107.    The Brokerage Defendants implemented the conspiracy by requiring and/or encouraging their contractors, agents, subsidiaries, and franchisees (and by necessary implication, the subsidiaries' and franchisees' agents and realtors) to comply with NAR's rules.

108.    Upon information and belief, franchise agreements between the Brokerage Defendants and their franchisees require those franchisees and their agents to: (a) comply with NAR's Code of Ethics; (b) join and comply with the rules of the local realtor association; and (c) participate in and comply with the rules of the local MLS, which include the mandatory rules in the NAR Handbook.

109.    Executives from the Brokerage Defendants actively participated in the management and operation of NAR. For example, executives of franchisees and other affiliates of the Brokerage Defendants dominated the 2018 eight-person Leadership Team that managed NAR's day-to-day operations and the immediate past NAR President, Elizabeth Mendenhall, is the CEO of RE/MAX Boone Realty in Columbia, Missouri.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

110.    Both NAR's Handbook and in its Code of Ethics were drafted, developed, and promulgated by the NAR Board of Directors or NAR's Professional Standards Committee. The Brokerage Defendants use their leadership roles in NAR to implement the conspiracy by reviewing NAR's Rules and agreeing to them at yearly meetings, and NAR further advances the conspiracy by re-issuing its rules.

111.    Because of the Brokerage Defendants' agreements with their local franchisees and agents, their employee policy and procedures manuals, the Brokerage Defendants' leadership roles in NAR, and pressure from the Brokerage Defendants, local franchisees and agents located in the BAREIS Counties agreed to ensure that BAREIS MLS's rules contain the Anticompetitive Broker Rules, which are the functional equivalents of Section 2-G-1 and Standard Practice 16-16.

112.    Accordingly, the Defendants, along with co-conspirator NAR, have furthered and participated in this agreement, combination, and conspiracy by adopting, implementing, and enforcing the Anticompetitive Broker Rules.

## ANTICOMPETITIVE EFFECTS OF THE CONSPIRACY

113.    Defendants' conspiracy has had the following anticompetitive effects throughout the BAREIS Counties:

    (a)    Class Members paid inflated buyer broker commissions and inflated total commissions.

    (b)    Class Members were forced to pay commissions to buyer brokers, thereby substantially inflating the cost of selling their homes.

    (c)    Class Members were compelled to set a high buyer broker commission to induce buyer brokers to show their homes to the buyer brokers' clients.

    (d)    The retention of a buyer broker was severed from the setting of the broker's commission; the home buyer retained the buyer broker, while the home seller's agent sets the buyer broker's compensation.

    (e)    Price competition among brokers to be retained by home buyers was restrained, as was price competition among brokers seeking to be retained to sell homes.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1

2

(f)     Competition among home buyers was restrained by their inability to lower

buyer-broker commissions.

3

4

(g)     The Brokerage Defendants profited from inflated buyer-broker commissions

and inflated total commissions.

5       114.   There are no pro-competitive effects of Defendants' conspiracy.

6       115.   Even if any alleged pro-competitive effects exist, they are substantially outweighed

7    by the anticompetitive effects of Defendants' conspiracy.

8       116.   Economic evidence shows that Defendants' conspiracy has resulted in inflated total

9    commissions and inflated buyer-broker commissions paid by Class Members, at levels above what

10   would be paid in a competitive market.

11      117.   Economists Natalya Delcoure and Norm Miller compared international real estate

12   commissions with those in the United States,[29] and concluded the following:

13            Globally, we see much lower residential commission rates in most of
              the other highly industrialized nations, including the United Kingdom
14            (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand .
              . . . In the UK, the [total] commission rates average less than 2%. . . .
15            In New Zealand and South Africa, [total] commission rates average
              3.14%. In Singapore, the [total] commission rates also tend to run
16            around 3%.[30]

17

18   They also found variation within countries. For example, in the UK, they found that "1%-2% is

19   typical" for total broker commissions, but that in "very competitive areas" the total rates ranged

20   between "0.5-0.75%" whereas in lower priced areas the range was "as high as 3.5%."[31] Ultimately,

21   the economists concluded that, "based on global data, the [total] US residential brokerage fees

22   should run closer to 3.0%."[32]

23      118.   In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to

24

25   [29]  *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees
26   and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).

27   [30]  *Id*. at 14.

     [31]  *Id*. at 17.

28   [32]  *Id*. at 13.

the seller and buyer brokers) in the BAREIS Counties average between 5% and 6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and 3%. These numbers have remained stable despite both rising home prices and the decreasing role of the buyer broker during a time when many prospective home buyers have already scoured the market through online real estate marketplaces.

119.   Rule 11.2 encourages and facilitates anticompetitive steering away from brokers who deviate from the standard commission practices and rates. It enables buyer brokers to identify and compare the buyer-broker compensation offered by every seller and then steer their clients toward homes offering higher commissions.

120.   As confirmed by economic studies and literature, steering has clear anticompetitive effects. Steering deters reductions from the standard commission and enables brokers to avoid doing business with, or to retaliate against, buyer brokers who try to compete by offering significant discounts.

121.   Defendants have further exacerbated the anticompetitive effects of steering by implementing the requirement that buyer broker commissions be specified in only certain ways (*i.e.*, a percentage of the sale price), which makes it easy for individual realtors or agents to see and compare offers.

122.   The economic evidence demonstrates that Defendants' conduct operates to restrain competition in several respects in real estate markets with the result being that home sellers pay far more than they otherwise would in a competitive market.

123.   Defendants' conspiracy was designed to raise and maintain real estate commissions at elevated and supra-competitive levels. Defendants provided uniform training to seller brokers to obtain commission rates in the 5% to 6% range, and to split commissions roughly equally with buyer brokers. Because these commission offers are blanket offers and agreed to prior to listing the house, buyer brokers receive the same amount in commission regardless of the effort made, stifling competition.

124.   Despite significant changes in technology that should have substantially reduced commission charges, Defendants have managed to keep the standard real estate commission

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1   stabilized at around 5% to 6% throughout the Class Period.

2   **MARKET POWER AND GEOGRAPHIC SCOPE OF BAREIS' MLS**

3   125.   Although MLSs exist throughout the United States, access to BAREIS MLS is

4   critical for brokers to represent home buyers and sellers in connection with the sale and purchase

5   of homes in the BAREIS Counties.

6   126.   Most homes sold in the BAREIS Counties were listed on BAREIS MLS by brokers

7   that are subject to BAREIS MLS's rules and regulations. BAREIS touts itself as "the primary

8   platform used by more than 60,000 real estate professionals to share information on properties for

9   sale in Sonoma, Marin, Napa, Solano & Mendocino Counties."[33]

10  127.   Collectively, BAREIS and the Brokerage Defendants provide a significant portion

11  of the residential real estate broker services in these areas.

12  128.   Any buyer broker in the BAREIS Counties who wishes to compete outside of

13  Defendants' conspiracy would face insurmountable barriers. Non-conspiring brokers would need

14  to establish an alternative listing service to compete with the conspiring brokers, or alternatively,

15  attempt to compete without access to a listing service.

16  129.   A seller's broker without access to BAREIS MLS would be unable to reach most

17  potential buyers, and a broker who represented a buyer without using a listing service would lose

18  access to most sellers. Brokers cannot compete effectively without access to an MLS and it is in

19  the client's best interest to market a property on an MLS, subjecting it to the anticompetitive rules.

20  130.   For an alternative listing service to compete effectively with BAREIS MLS, it

21  would need to have listings as comprehensive, or at least nearly so, as BAREIS MLS. However,

22  brokers and their individual realtors or agents who currently profit from inflated buyer broker

23  commissions and total commissions have minimal incentive to participate on an alternative listing

24  service that would generate lower total commissions and lower buyer broker commissions and

25  seller broker commissions. Furthermore, many buyers would be reluctant to retain a buyer broker

26  operating on an alternative listing service that required them to pay the buyer broker commission,

27  _____

28  [33] BAREIS MLS, About BAREIS – The Benefits of BAREIS MLS®, *available at* https://bareis.com/about/consumers-benefits.html

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1  when other buyer brokers operating on BAREIS MLS are entirely compensated by home sellers.

2  Accordingly, seller brokers on an alternative listing service would struggle to attract buyer brokers

3  and their buyer clients.

4      131.    Moreover, many home sellers would not retain brokers using a new and unfamiliar

5  alternative listing service that had no track record of success and had failed to attract sufficient

6  buyers and buyer brokers. Any listing service attempting to compete with BAREIS MLS would

7  likely fail to attract enough property listings to operate profitably and be competitive. The absence

8  of listing services that compete with BAREIS MLS reflects the very substantial barriers to entry.

9                          **CONTINUOUS ACCRUAL**

10     132.    During the Class Period, the Defendants repeatedly charged buyer-broker

11  commissions and total commissions that were inflated because of the conspiracy. These inflated

12  commissions were paid by Plaintiff and Class members in connection with the sale of residential

13  real estate listed on BAREIS MLS, in the BAREIS Counties. Each payment of these inflated

14  commissions by Plaintiff and the other Class members injured them and gave rise to a new cause

15  of action for that injury.

16     133.    During the Class Period, the Defendants have maintained, implemented, and

17  enforced the conspiracy in the BAREIS Counties.

18                      **CLASS ACTION ALLEGATIONS**

19     134.    Plaintiff brings this action on behalf of herself and all others similarly situated, and

20  as a class action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3), on behalf of members

21  of the following Class ("the Class"):

22          All persons and entities in the United States who, from December 8,
            2019, paid a buyer broker commission in connection with the sale of
23          residential real estate listed on the BAREIS MLS.

24     135.    Excluded from the Class are Defendants, their officers, directors, and employees;

25  any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir

26  or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over

27  this action and the members of his/her/their immediate family and judicial staff, jurors, and

28  Plaintiffs' counsel and employees of their law firms.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

136.    ***Numerosity***. The members of the Class are so numerous as to render their individual joinder impracticable. Although the precise number of Class members is unknown, based upon information and belief Plaintiff alleges that the Class contains thousands of members. The true number of Class members is known by Defendants, however, and, thus, may be notified of the pendency of this action through electronic mail, first class mail and/or by published notice.

137.    ***Adequacy of Representation***. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained trial counsel highly experienced in complex litigation including complex antitrust class action litigation, and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interest in this action that is adverse or antagonistic to the interests of the Class.

138.    ***Existence and Predominance of Common Questions of Law and Fact.*** Common questions of law and fact exist as to all members of the Class and predominate over any question affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

(a)     Whether the Defendants knowingly participated in the conspiracy;

(b)     Whether Defendants' conspiracy caused Plaintiff and Class members to pay inflated commissions;

(c)     Whether Plaintiff and Class members were injured as a result of Defendants' anticompetitive conduct;

(d)     Whether Defendants' anticompetitive conduct was a material cause of Plaintiff's and Class members' injuries;

(e)     Whether the injury can be measured using evidence common to the Class;

(f)     Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

(g)     Whether Defendants' conduct violates the UCL; and

(h)     Whether Plaintiff and Class members are entitled to restitution and/or injunctive relief.

139.    ***Typicality***. Plaintiff's claims are typical of the claims of the members of the Class

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

because their claims arise from the same course of conduct by Defendants and the relief sought within the Class is common to each member.

140.   **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

141.   Furthermore, the Class may be certified under Rule 23 (b)(2) because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class as a whole.

### ANTITRUST INJURY

142.   By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid buyer broker commissions and thus higher total commissions than they would have paid in the absence of Defendants' anticompetitive conduct, and as a result have suffered damages.

143.   There are no pro-competitive effects of Defendants' conduct that are not substantially outweighed by the anticompetitive effects.

144.   Economic evidence supports the conclusion that Defendants' anticompetitive conduct has resulted in Class members paying buyer-broker commissions and total commissions that have been inflated to supra-competitive levels above what they would be in a competitive market.

145.   Defendants' conduct was a material cause of the injuries sustained by Plaintiff and Class members.

146.   The injuries sustained by Plaintiff and Class members as a result of Defendants' conduct are injuries of the type that the antitrust laws were intended to prevent.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

# **FIRST CAUSE OF ACTION**

### **Violation of Section 1 of the Sherman Act**
### **15 U.S.C. § 1**

147.    Plaintiff repeats and incorporates by reference each paragraph above as if set forth in full herein.

148.    The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.

149.    Defendants engaged and are engaging in a contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

150.    By adopting and implementing rules and regulations that require Class members to make a blanket, unilateral offers of buyer broker compensation when listing a property on the BAREIS MLS, Defendants unlawfully restrain trade by:

> (a)    requiring Class members to pay buyer-broker commissions, a cost that, in a competitive market, would be paid by the buyer;

> (b)    preventing a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer; and

> (c)    causing Class members to pay inflated commissions.

151.    The conspiracy alleged herein consists of a continuing agreement or understanding among Defendants to adopt, implement, and enforce rules and regulations for any realtor who lists a property for sale on the BAREIS MLS. These rules require all Class members to agree to make a blanket, unilateral offer of buyer broker compensation when listing a property on the BAREIS MLS:

> (a)    Rule 11.2 forces Class members to pay buyer-broker commissions, a cost that, in a competitive market, would be paid by the buyer.

> (b)    Rule 11.5 prevents a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer.

> (c)    The Defendants restrain trade by enforcing policies and practices that artificially inflate commission rates.

152.    Defendants have restrained competition in the BAREIS Counties by adopting rules that require Class members to pay: (1) buyer-broker commissions, (2) inflated buyer-broker commissions, and (3) inflated total commissions. This harm to competition substantially outweighs any competitive benefits from the conspiracy.

153.    Defendants' unlawful restraint affects interstate commerce because certain of the Defendants who are participating in and profiting from the conspiracy are located outside of the State of California.

154.    Defendants' conspiracy has caused buyer-broker commissions and total commissions in BAREIS Counties to be higher than they would have been but for the conspiracy. Plaintiff and the other members of the Class paid these inflated commissions in connection with the sale of residential real estate listed on BAREIS MLS in the BAREIS Counties. Absent Defendants' conspiracy, Plaintiff and the Class members would have paid lower commissions.

155.    Defendants' agreement to restrain trade is a *per se* violation of Section 1 of the Sherman Act.

156.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the Class members have been injured in their business or property in an amount to be proven at trial.

### SECOND CAUSE OF ACTION

**Violation of the Cartwright Act**
**California Business & Professions Code §§ 16720 *et. seq.***

157.    Plaintiff repeats and incorporates by reference each paragraph above as if set forth in full herein.

158.    Defendants have engaged in conduct that was and continues to be an unreasonable restraint of trade or commerce in violation of the Cartwright Act, California Business and Professions Code §§ 16720 *et. seq*.

159.    By adopting and implementing rules and regulations that require Class members to make a blanket, unilateral offer of buyer-broker compensation when listing a property on the BAREIS MLS, Defendants unlawfully restrain trade by:

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

(a)    requiring Class members to pay a cost that, in a competitive market, would be paid by the buyer;

(b)    preventing a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer; and

(c)    causing Class members to pay inflated commissions.

160.    Defendants have unlawfully restrained competition in the BAREIS Counties by adopting rules that require Class members to pay: (1) buyer-broker commissions, (2) inflated buyer-broker commissions, and (3) inflated total commissions. Defendants' anticompetitive conduct constitutes a *per se* violation of California's antitrust law and is, in any event, an unreasonable and unlawful restraint of trade. The anticompetitive effects of Defendants' conduct far outweigh any purported non-pretextual, procompetitive justifications.

161.    Defendants' conspiracy has required Class members to pay buyer-brokers, to pay inflated buyer-broker commissions and inflated total commissions and has restrained price competition among buyer-brokers in the BAREIS Counties. This harm to competition substantially outweighs any competitive benefits from the conspiracy.

162.    Defendants' unlawful restraint of trade has caused and continues to cause buyer-broker commissions and total commissions paid by Class members to be higher than they would have been but for the conspiracy, and thus substantially affects California commerce. Plaintiff and Class members paid these inflated commissions in connection with the sale of residential real estate listed on the BAREIS MLS.

163.    Plaintiff and Class members have suffered injury in fact and lost money because of Defendants violations of law and wrongful conduct, for which they seek damages (trebled where appropriate) including pre-judgment interest.

164.    Defendants' conduct is continuing and unless equitable relief is granted, artificially and anticompetitively inflated commission rates will continue unabated and cause harm.

///
///

### THIRD CAUSE OF ACTION

**Violation of California's Unfair Competition Law**
**California Business and Professions Code §§ 17200, *et seq.***

165.    Plaintiff repeats and incorporates by reference each paragraph above as if set forth in full herein.

166.    Defendants' conduct constitutes unlawful and unfair business acts and practices within the meaning of California's Unfair Competition Law, California Business and Professions Code §§ 17200 *et. seq.* ("UCL").

167.    The UCL prohibits "any unlawful, unfair or fraudulent business act or practice…" Cal. Bus. & Prof. Code § 17200.

168.    Defendants' acts or practices are unlawful because they violate, *inter alia*, the Sherman Antitrust Act and the California Cartwright Act.

169.    Defendants' acts and practices are unfair in that: (i) they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers; (ii) they harmed and continue to harm consumers in a manner far outweighing any legitimate utility of their conduct; (iii) the injury was not one that consumers reasonably could have avoided; and (iv) they were contrary to legislatively declared and public policy.

170.    Defendants financially benefited from their conduct to the financial detriment of Plaintiff and Class members.

171.    As a direct and proximate result of Defendants' unlawful and unfair acts and practices, Plaintiff and Class members suffered substantial injury in fact, and lost money and/or property. The injuries suffered by the Plaintiff and Class members include, but are not limited to, paying buyer-broker commissions and higher total commissions than they would have paid in the absence of Defendants' anticompetitive conspiracy.

172.    Defendants' conduct is continuing and unless injunctive relief is granted, artificially and anticompetitively inflated commission rates will continue unabated.

173.    Defendants thus have engaged in unlawful and unfair business acts and practices in violation of the UCL, entitling Plaintiff and Class members to judgment and relief against

1  Defendants as set forth in the Prayer for Relief.

2  **FOURTH CAUSE OF ACTION**

3  **Unjust enrichment**

4  174.   Plaintiff repeats and incorporates by reference each paragraph above as if set forth

5  in full herein.

6  175.   To the extent required, this claim is pleaded in the alternative to the other claims in

7  this Complaint.

8  176.   Defendants have reaped and retained substantially higher profits due to their

9  unlawful agreements and scheme.

10  177.   Plaintiff and Class members have conferred and continue to confer an economic

11  benefit upon Defendants in the form of profits resulting from the unlawful overcharges from real

12  estate commissions by adopting and implementing rules and regulations that require Class

13  members to make a blanket, unilateral offer of buyer broker compensation when listing a property

14  on the BAREIS MLS, as described herein, to the economic detriment of Plaintiff and Class members.

15  178.   Defendants' financial gain from their unlawful conduct is traceable to overpayments

16  by Plaintiff and Class members for real estate broker commissions.

17  179.   Defendants have benefited from their unlawful acts, and there is no legal basis for

18  Defendants to be permitted to retain any of the ill-gotten gains resulting from overpayments made

19  by Plaintiff and Class members for real estate broker commissions during the Class Period.

20  180.   The financial benefits the Defendants derived from overcharging Plaintiff and Class

21  members is a direct and proximate result of Defendants' unlawful practices described herein.

22  181.   The financial benefits Defendants derived are ill-gotten gains that rightfully belong

23  to Plaintiff and Class members who paid, and continue to pay, artificially inflated broker

24  commissions that inure to Defendants' benefit.

25  ///

26  ///

27  ///

28  ///

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and members of the Class, requests relief and prays for judgment against Defendants as follows:

(a)     An Order certifying the Class under the appropriate provisions of Rule 23 (b)(2) and (b)(3) of the Federal Rule of Civil Procedure;

(b)     An Order appointing Plaintiff as the Class representative and appointing her counsel as Class Counsel;

(c)     Declarations that the actions of Defendants, as set forth above, are unlawful and in violation of the Sherman Act, the Cartwright Act, and the UCL;

(d)     An award to Plaintiff and the Class members for actual damages trebled in an amount to be determined at trial;

(e)     A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from (1) requiring that sellers pay the buyer broker, (2) continuing to restrict competition among buyer brokers and seller brokers, and (3) engaging in any conduct determined to be unlawful;

(f)     Appropriate injunctive relief under the UCL;

(g)     For restitution and restitutionary disgorgement of all monies wrongfully obtained from Plaintiff and the Class by Defendants;

(h)     An award to Plaintiff and the Class members of pre- and post-judgment interest;

(i)     An award to Plaintiff and the Class members for their costs of suit, including reasonable attorneys' fees and expenses; and

(j)     An award of such other relief as the Court may deem just and proper.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of herself and all others similarly situated, hereby demands a jury trial of all issues so triable.

DATED:  January 12, 2024                **PEARSON WARSHAW, LLP**

By:        */s/ Jill M. Manning*

JILL M. MANNING (Bar No. 178849)
jmanning@pwfirm.com
**PEARSON WARSHAW, LLP**
555 Montgomery St., Suite 1205
San Francisco, California 94111
Telephone: (415) 433-9000

DANIEL L. WARSHAW (Bar No. 185365)
dwarshaw@pwfirm.com
BOBBY POUYA (Bar No. 245527)
bpouya@pwfirm.com
NAVEED ABAIE (Bar No. 323338)
nabaie@pwfirm.com
ERIC J. MONT (Bar No. 319592)
emont@pwfirm.com
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300

DOUGLAS MILLEN (*Pro Hac Vice* Forthcoming)
dmillen@fklmlaw.com
ROBERT WOZNIAK (*Pro Hac Vice* Forthcoming)
rwozniak@fklmlaw.com
MATTHEW RUAN (Bar No. 264409)
mruan@fklmlaw.com
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL  60069
Telephone:  (224) 632-4500

*Attorneys for Plaintiff and the Proposed Class*

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111